Michael W. Berg AZ Bar #020374
Attorney at Law
2320 East Baseline Road, Suite 148, #459
Phoenix, AZ 85042-6951
480-235-5747
mwb@mwberglaw.com
*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

DESERT PLANTS CONSERVANCY LLC, an Arizona limited liability company; MARIE (MIMI) PIERRON, an unmarried individual; AWD RANCH LLC, an Arizona limited liability company; NILES LIPIN, an unmarried individual; KESSEL FARM LLC, an Arizona limited liability company; LORAINE KESSELRING, an unmarried individual;

        Plaintiffs,

        v.

JOSEPH M. PARSONS and JANE ROE PARSONS, husband and wife; CLAY H. PARSONS and JANE DOE PARSONS, husband and wife; THE PARSONS CO., INC.; THE ESTATE OF ROBERT W. WALKER; THE WALKER FAMILY RANCH TRUST; GARY R. WALKER and GEORGIA A. WALKER, husband and wife, individually and as representatives of THE ESTATE OF ROBERT W. WALKER and THE WALKER FAMILY RANCH TRUST; EVE F. WALKER, widow of Robert W. Walker; WALKER RANCHES LLLP; ALBERT E. YENDES, JR. and JANE ROE YENDES, husband and wife; GEOFFREY K. BRIMHALL and JANE ROE BRIMHALL, husband and wife; LOUIE W. PUROLL and

Case No. 2:11-cv-01599-ROS

**FIRST AMENDED COMPLAINT**

**Federal RICO Claim under 18 USC § 1961,** *et seq.;*
**Civil RICO Conspiracy; Violation of Civil Rights, 42 U.S.C. § 1983; Arizona Racketeering Act ("Arizona RICO"), A.R.S. § 13-2314.04**

**JURY TRIAL DEMANDED**

**BRIEF TO FOLLOW**

1

1  JANE ROE PUROLL, husband and wife;
   MELVIN C. COHEN and JANE ROE COHEN,
2  husband and wife; PAUL A. LOUCKS and JANE
   ROE LOUCKS, husband and wife; KEVIN R.
3  KEATING and JANE ROE KEATING, husband
   and wife; THE KEATING LAW FIRM, PLC.,
4  MESCH, CLARK & ROTHSCHILD, P.C.;
   JOHN DOES I-X, JANE ROES I-X; WHITE
5  PARTNERSHIPS I-X; BLACK
   CORPORATIONS I-X;
6
7          Defendants.

8

9          Plaintiffs[1] DESERT PLANTS CONSERVANCY LLC (hereinafter "DPC"), MARIE

10  (MIMI) PIERRON (hereinafter "Pierron"), AWD RANCH LLC (hereinafter "Ranch"),

11  NILES LIPIN, KESSEL FARM LLC, and LORAINE KESSELRING (hereinafter jointly

12  referred to "Kesselring") by and through counsel undersigned for their Complaint allege as

13  follows:

14

15

16      ///

17

18      ///

19

20      ///

21

22      ///

23

24

25  [1] "Plaintiffs" as used herein refers collectively to all the Plaintiffs. "Conservancy" as
    used herein refers collectively to DPC, Pierron, Ranch, and Lipin. "Kesselring" as
26  used herein refers collectively to Kessel Farm LLC, Loraine Kesselring, and/or any
    business interest of Loraine Kesselring adversely affected by the Enterprise.
27

# TABLE OF CONTENTS

TABLE OF CONTENTS ............................................................................ 3

SUMMARY OF COMPLAINT ............................................................... 4

JURISDICTION AND VENUE ............................................................... 5

PLAINTIFFS ........................................................................................... 5

DEFENDANTS ........................................................................................ 6

OTHER ASSOCIATED-IN-FACT PARTIES ........................................ 8

PLAINTIFFS' PROPERTY AND BUSINESS INTERESTS ................. 9

PROPERTY OWNED OR CONTROLLED BY DEFENDANTS..................... 10

LITIGATION AFFECTED AND REFERRED TO IN THIS COMPLAINT..... 11

FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS ........................ 12

FIRST CAUSE OF ACTION ................................................................. 82

    FEDERAL RICO CLAIM UNDER 18 U.S.C. § 1962(c) ............................. 82

SECOND CAUSE OF ACTION ............................................................ 98

    CIVIL RICO CONSPIRACY UNDER 18 U.S.C. 1962(d) ........................... 98

THIRD CAUSE OF ACTION .............................................................. 101

    VIOLATION OF CIVIL RIGHTS UNDER 42 U.S.C. § 1983 ................... 101

FOURTH CAUSE OF ACTION .......................................................... 113

    VIOLATION OF ARIZONA ANTI-RACKETEERING ACT UNDER
    ("ARIZONA RICO") A.R.S. § 13-2314.04 ............................................. 113

REQUESTED RELIEF ......................................................................... 115

# SUMMARY OF COMPLAINT[2]

1.      This case stems from the actions of a group of corporate entities and/or LLCs, and/or individuals, and/or licensed professionals who, since the fall of 2007, have colluded for the common benefit of their Associated-in-Fact Enterprise. This conduct has been and still is ongoing by the Defendants, some of who have illegally gained valuable private properties to expand their land development empires under the guise of cattle ranching.

2.      This pattern of racketeering activity has continued through the named Defendants and includes attorneys, state and county agency officials, and law enforcement officers who have participated in and have aided and abetted the actions of the participants in the racketeering activity. Defendants, jointly and severally, violated the Federal Racketeering Influenced and Corrupt Organizations Act ("RICO") and the Arizona Racketeering Act laws ("Arizona RICO") through a scheme and artifice to defraud and financially devastate Plaintiffs and regain/gain valuable properties owned by Plaintiffs. As a result of this pattern of unlawful acts by Defendants, Plaintiffs suffered severe financial damages.

3.      Plaintiffs also allege that Defendants, as joint actors with state officials and, in particular, officials of the Superior Court for Pinal County, have committed flagrant civil rights violations that deprived Plaintiffs of their due process rights under 42 U.S.C. § 1983. Plaintiffs allege that Defendants' respective counsel have engaged in conduct that goes beyond advocacy and have colluded with one another to improperly influence the administration of justice in the Pinal County Superior Court.

---

[2] The headings herein are for ease of reference are not to be construed as allegations of the Complaint.

4

**JURISDICTION AND VENUE**

4.      This action arises under the Federal Racketeering Influenced and Corrupt Organizations Act ("RICO"), 18 USC § 1961, et seq. Consequently, this Court has federal question jurisdiction under the U.S. Constitution, laws, or treaties all pursuant to 28 U.S.C. §1331 and 18 U.S.C. § 1964(c) and, to the extent asserted, supplemental jurisdiction pursuant to 28 U.S.C. § 1367. Claims arising under 42 U.S.C. § 1983 are governed in accord with state law for purposes of the statute of limitations. The statute of limitations, however, for accrual purposes, is controlled by federal law. This includes equitable tolling and/or tolling of the statute under the basis of fraudulent concealment. Subject matter jurisdiction exists under 28 U.S.C. § 1343(a)(4).

5.      The state claims are pendant to the federal claims asserted in this complaint and arise out of the same facts and circumstances so that all requirements of *United Mine Workers of America v. Gibbs,* 383 U.S. 715, 86 S. Ct. 1130 (1966) are fulfilled.

6.      Venue is proper under 28 U.S.C. §1391, together with statute-specific venue provisions applicable to the counts enumerated below.

**PLAINTIFFS**

7.      Plaintiffs Desert Plants Conservancy LLC and AWD Ranch LLC are now and at all relevant times herein were limited liability companies with their principal place of business in Maricopa County, Arizona.

8.      Plaintiff Niles Lipin, a single man, and Marie ("Mimi") Pierron, a fem sole, at all relevant times herein were residents of Maricopa County, Arizona.

9.      Plaintiff Kessel Farm LLC is now, and at all relevant times herein was, a limited

liability company that operated its business in Pinal and Maricopa Counties, Arizona.

10.      Plaintiff Loraine Kesselring, at all relevant times herein was a resident of Pinal County, Arizona. Kesselring has since become a resident of Maricopa County.

## DEFENDANTS

11.      Defendants Joseph M. Parsons, Clay H. Parsons, Geoffrey Brimhall, Melvin C. Cohen, and Paul A. Loucks are now, and at all relevant times herein were, residents of Pima County, Arizona.

12.      Defendants Jane Roe Parsons, Jane Smith Parsons, Jane Roe Cohen, and Jane Roe Loucks are fictitious individual defendants who may have been married to the Defendants listed in Paragraph 13, and they are accordingly sued herein by such fictitious names. Plaintiffs will seek leave to amend this complaint to insert the true names of said defendants when the same have been ascertained.

13.      Defendant Gary R. Walker and Georgia Walker, husband and wife, Robert W. Walker (now deceased), The Estate of Robert W. Walker and the Walker Family Ranch Trust being substituted for him, Eve F. Walker, and Albert E. Yendes are now, and at all relevant times in this complaint therein were, residents of the State of Colorado.

14.      Defendant Jane Roe Yendes is a fictitious individual defendant who may have been married to Defendant Albert E. Yendes at the time of the incidents described in Plaintiffs' Complaint and is accordingly sued herein by such fictitious name; Plaintiffs will seek leave to amend this complaint to insert the true name of the defendant when the same has been ascertained.

15.      At all times material hereto, Albert E. Yendes was acting within the course and

scope of his employment as a duly authorized agent of Defendants Gary R. Walker, Georgia A. Walker, Robert W. Walker, and/or Eve F. Walker.

16.    Defendant Kevin R. Keating is now, and at all relevant times herein was, a resident of Maricopa County, Arizona.

17.    Defendant Louie W. Puroll is now, and at all relevant times herein was, a resident of Pinal County, Arizona.

18.    Defendant Jane Roe Puroll is a fictitious individual defendant who may have been married to Defendant Louie W. Puroll at the time of the incidents described in Plaintiffs' Complaint and is, accordingly, sued herein by such fictitious name; Plaintiffs will seek leave to amend this complaint to insert the true name of the defendant when the name has been ascertained.

19.    Defendant Kevin R. Keating is now, and at all relevant times herein was, a resident of Maricopa County, Arizona.

20.    Defendant Jane Roe Keating is a fictitious individual defendant who may have been married to Defendant Kevin R. Keating at the time of the incidents described in Plaintiffs' Complaint and is accordingly sued herein by such fictitious name; Plaintiffs will seek leave to amend this Complaint to insert the true name of the defendant when the same has been ascertained.

21.    At all times material hereto, married defendants were acting on behalf of the marital community as well as themselves.

22.    At all times material hereto, Defendant The Keating Law Firm PLC operated its business within Maricopa County, Arizona.

7

23.     At all times material hereto, Defendant Mesch, Clark & Rothschild, P.C., and The Parsons Co., Inc. operated its businesses within Pima County, Arizona.

24.     Defendants John Does I–X, Jane Roes I–X, White Partnerships I–X, and Black Corporations I–X are fictitious persons and entities who may have conspired or committed acts alleged herein and whose identities are unknown at this time. Plaintiffs reserve the right to supplement this complaint upon further discovery of the true identities of said fictitious entities and persons.

25.     All of the Defendants herein caused acts and events to occur in the State of Arizona in the Counties of Pinal, Pima, and Maricopa. These acts and events are the subject matter out of which the claims alleged in this Complaint arose.

26.     All of the Defendants The Parsons Co., Inc., Joseph M. Parsons, Clay H. Parsons, The Walker Ranches LLLP, Gary Walker, Georgia Walker, Eve R. Walker, The Estate of Robert W. Walker, Walker Family Ranch Trust, Albert Yendes, Geoffrey Brimhall and Louis Puroll, Kevin Keating, Paul Loucks, Melvin Cohen, The Keating Law Firm, PLC, and Mesch Clark & Rothschild, PC, are Associated-in-Fact individuals or entities who acted jointly and in conspiracy with the others to accomplish the illegal ends specified in this Complaint as an Associated-in-Fact Enterprise ("The Enterprise").

27.     The Defendants each aided and abetted the illegal acts set forth in this Complaint.

## OTHER ASSOCIATED-IN-FACT PARTIES
### Not Yet Named Defendants

28.     Bill Webster, Bradley Geeck, Elise Moore, Phil Hogue, Tom Whitmer, Jonathan Rothschild, Patrick Lopez, Parsons Properties LLC, Marana Property I LLC, P-3

Investments LLC, The Parsons Ranch LLC, P5 Development LLC, Dripping Springs Development Company LLC, Bit & Bridle Development Company LLC, P3 & G LLC, P3 & T LLC, J Parsons Steel Builders Inc, Parsons Steel Erectors, Inc, New West Steel Construction LLC, JP Livestock Co. LLC, Marana Stockyard and Livestock Market, Inc., and EEP Enterprises LLC are Associated-in-Fact individuals or entities who participated directly or indirectly in the Enterprise's racketeering activity, but have not yet been named as Defendants.

## PLAINTIFFS' PROPERTY AND BUSINESS INTERESTS

29.     Plaintiffs DPC and Ranch were each formed as a separate, single-member LLC in 2002 by members Plaintiff Mimi Pierron and Plaintiff Niles Lipin, respectively. The LLCs were created to enter into joint venture projects that involved the purchase of land. In pursuit of their goals, DPC and Ranch each purchased two non-contiguous parcels in 2002 from Defendants Robert W. Walker and Eve F. Walker for approximately $880,000 in total. The combined four separate parcels comprised approximately 1,100 acres of land (the "1,100 Acres") near Picacho Peak in Pinal County, Arizona.

30.     DPC and Ranch, along with other investors, invested over $3 million dollars into the development of the 1,100 Acres. DPC and Ranch intended to create a sustainable farming and nursery operation, carry out several humanitarian service projects, and pursue several commercial projects that were interrelated, with the intent to sell products in interstate and foreign commerce. Within the first year after purchase, DPC and Ranch collectively drilled three wells and discovered that there was a water resource containing billions of gallons of water under the 1,100 Acres. DPC's and Ranch's properties also contained four ponds.

31.     Plaintiff Kesselring is the owner of 30 acres of land (the "30 Acres") near Picacho Peak in Pinal County, Arizona. Kesselring purchased this acreage in 2004 from a private party for $60,000 cash. Kesselring's 30 Acres are situated in the foothills of the Picacho Mountains and one corner is contiguous with a corner of the 1,100 Acres.

32.     Several months prior to her March of 2004 purchase, Conservancy granted Kesselring a verbal easement, allowing her access across the 1,100 Acres to reach her 30 Acres. Recorded in 2009, this easement provided the only legal access for Kesselring to get to and from her 30 Acres. After doing due diligence regarding the ownership of the 1,100 Acres, Kesselring relied on this easement when she purchased her property. Upon completion of her purchase, Kesselring began open, obvious, and continuous use of the easement until the Enterprise erected a permanent barrier in November 2010.

33.     Kesselring with other investors invested approximately $700,000 in the development of the 30 Acres as a sustainable farming operation.

34.     In addition to having a natural source of water, the 30 Acres was one of only two other large private parcels of property besides the 1,100 Acres anywhere in the surrounding area.

## PROPERTY OWNED OR CONTROLLED BY DEFENDANTS

35.     At all pertinent times herein, The Parsons Co., Inc. owned twenty acres of land (the "20 Acres") located entirely within the 1,100 Acres with an easement that ran across the 1,100 Acres to the 20 Acres. The Deed of Easement did not specify the easement's location, width, or intended use.

10

**LITIGATION AFFECTED AND REFERRED TO IN THIS COMPLAINT**

36.     The Parsons Co., Inc. v. AWD Ranch LLC, Desert Plants Conservancy LLC, Robert W. Walker, and Eve F. Walker in the Superior Court of Arizona in Pinal County CV2004-01368 (hereinafter the "1,100 Acres case").

37.     Kesselring v. Desert Plants Conservancy LLC, AWD Ranch LLC, The Walkers, and The Parsons Co., Inc. in the Superior Court of Arizona in Pinal County CV2009-03687 (hereinafter "30 Acres case").

38.     The Parsons Co., Inc. v. Fidelity National Title Insurance Agency Inc. in the Superior Court of Arizona in Pima County CV2005-6259 (hereinafter the "Parsons-Fidelity case").

39.     AWD Farms, LLC v. Desert Plants Conservancy LLC, AWD Ranch LLC, Mimi Pierron, and Niles Lipin in the Superior Court of Arizona in Maricopa County CV2008-029422 (hereinafter the "AWD Farms case").

40.     Arizona Court of Appeals, Division Two, DPC/Ranch Special Action 2CA-SA2009-0008.

41.     Arizona Court of Appeals, Division Two, Kesselring Special Action 2CA-SA2009-0088.

42.     Supreme Court of Arizona, Kesselring Petition for Review of a Special Action Decision of the Court of Appeals CV-10-0060-PR.

43.     Arizona Court of Appeals, Division Two, CA-CV 2011-0077.

44.     U.S. Bankruptcy Court, 2:11-bk-26500 and 2:11-bk-26502.

## FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS

45.     In January of 1998 Defendants Robert W. and Eve Walker owned a tract of land in Pinal County, Arizona totaling approximately 1,100 acres. On January 22, 1998, Robert and Eve Walker sold to the Parsons Co. Inc. 20 acres of that tract that were completely surrounded by the remaining acreage. The sale included a Deed of Easement in favor of Parsons described, in relevant part, as: "[a]n easement for ingress and egress to Property…" A contract regarding the Parsons Co. Inc.'s use of the remaining property was also signed at that time.

46.     In or about 2002, Conservancy contacted a real estate agent who then showed them the 1,100 Acres; the MLS listing for the 1,100 Acres specified that no cattle ranching had been conducted for over two years prior to the listing. Conservancy, with the awareness of the 20-acre parcel owned by Parsons, purchased the 1,100 Acres.

47.     In or about the end of September 2002, just days after the Conservancy closed escrow on the 1,100 Acres, Defendants Joseph Parsons and Clay Parsons informed Lipin that they had a contract with the Walkers to use the 1,100 Acres for ranching purposes without the impediments of fences or gates. They refused to provide a copy of said contract or any further information. At that time, Parsons also claimed that his family controlled the Sheriff, the County Attorney, and judges in Pinal County, and that Plaintiffs could never win in Court against Parsons.

48.     The title company assured the Conservancy that no such contract existed. Conservancy had neither actual nor constructive notice of the Walker-Parsons agreement because, although Pierron ultimately located it online, it had not been disclosed and had

been improperly recorded. Conservancy reasonably relied upon the representations of others and began investing significant financial resources into improving the 1,100 Acres. Conservancy never denied Parsons ingress or egress to and from their 20 acres.

49.     In March of 2003, the Parsons again threatened Plaintiff Lipin that any further attempts to finish fencing the perimeter of the 1,100 Acres and block the Parsons' access would be met with property destruction and numerous federal and state agency investigations, which Parsons claimed would bankrupt Plaintiffs.

50.     An employee of the Pinal County Assessor's Office told Lipin in or around March or April 2003 that "someone pulled some strings" to get Conservancy's 1,100 Acres re-assessed 1–2 years early and raising the property taxes by about 3400%. Joseph Parsons had previously said he controlled Pinal County agencies, so Plaintiffs believe that it was Parsons who caused the reassessment.

51.     In or about the beginning of May 2003, Joseph Parsons reiterated his earlier warning to Lipin, "You can't stop us. We already told you we control the county and judges and you're not going to get anywhere." On or about November 18, 2004, The Parsons Co., Inc. initiated a civil action in the Pinal County Superior Court, designated case no. CV 2004-01368, claiming an easement for cattle grazing rights over and on the 1,100 Acres.

52.     On or about May 5, 2005, the Court ruled that the Walker-Parsons agreement did not survive the sale of the 1,100 Acres to Conservancy; that Parsons' only rights to the 1,100 Acres were for their ingress and egress easement; and thus, by implication, that Parsons had no cattle grazing rights. The ruling was reflected and entered into a Minute Entry .

53.     A hearing was held on July 25, 2005 for argument on the proposed form of

13

judgment. Despite being ordered to do so, Parsons' attorneys failed to meet and confer with DPC/Ranch's counsel or to give the court an agreed-upon date for scheduling a hearing to resolve the issue of the easement's location and width. No hearing was scheduled, and for the next three years no further action with DPC/Ranch occurred in this litigation.

54.     Upon information and belief, Cohen has participated in providing legal services at MC&R for Parsons since at least 1989 and became lead counsel for Parsons in or about 2006. Cohen is a shareholder and a Director of MC&R. Upon information and belief, Loucks joined MC&R and became co-counsel for Parsons in or about 2006.

55.     On or about November 9, 2005, Parsons sued Fidelity National Title Insurance Agency Inc. ("Fidelity") regarding their easement rights.

56.     On or about June 2006, Plaintiffs were informed that a "neighbor" believed to be Parsons had flown over the nursery at close range and that a complaint falsely accusing Plaintiffs of the crime of illegally growing marijuana had been filed with the Pinal County Sheriff. A criminal investigation ensued with no violation found.

57.     In late spring and early summer 2007, Conservancy dredged some of the ponds on the 1,100 Acres to make them useful as a riparian area for wildlife, and started contacting agencies about applying for grants. With the actual and planned silt harvest, over a hundred thousand cubic yards of silt would be available for finishing the roads on the 1,100 Acres and to sell. Conservancy never benefitted from any of this work.

58.     In late July 2007, Joseph Parsons called Lipin and asked him if he knew anything about Al Yendes, who was coming to inspect the 1,100 Acres as an agent of the Walkers.

59.     On or about August 2007, Walkers' agent/employee Yendes traveled from Colorado

to Arizona. Lipin was advised to provide Yendes with a gate key so that he and Susan

Schauf ("Schauf"), the Walkers' attorney, could inspect the 1,100 Acres. Lipin also

provided a hand-drawn map showing them an alternate route. The inspection was performed

but the key was never returned.

60.     On or about September 2007, agents of the Enterprise illegally entered onto the

1,100 Acres after destroying fencing by the South gate entrance. It was at that point Parsons

and Walkers began working in conjunction as the Enterprise. Joseph Parsons had previously

boasted to Lipin that he had keys to the locks on the canal road gates and free use of their

private improved roads. Parsons was able to provide the Enterprise access to the South gate

of the 1,100 Acres; the private Central Arizona Project ("CAP") roads were the only

reasonable access at that time.

61.     On or about September 25, 2007, the Walkers disclosed a list of witnesses in Pinal

County Superior Court case no. CV 2004-01368. The witnesses, all employees of

governmental agencies, were named along with what they would be testifying to concerning

Plaintiffs' violations of State laws and regulations on the 1,100 acres. This list was disclosed

prior to any formal complaints being filed or the witnesses' investigation of the property.

62.     On or about October 1, 2007, John Graham, Regional Counsel for First American

Title Company ("FATCO"), notified Plaintiffs by letter that FATCO was withdrawing

financial support for legal representation in the 1,100 Acres lawsuit. The letter, dated

September 27, 2007, and that Parsons would no longer be part of the lawsuit. A trial date

had already been scheduled in this case for November 27, 2007.

63.     In October 2007, after Yendes had been seen driving on or near the 1,100 Acres, the

15

Enterprise again destroyed the same large area of fencing and gate that Conservancy had recently repaired and reposted with new "No Trespassing" signs.

64.     On or about October 15, 2007, Joe Parsons called Lipin stating he wanted to go to the property the next day. Later in October, unbeknownst to Conservancy, the Enterprise buried Conservancy's above-ground fuel storage tanks to falsely make them subject to governmental regulation as underground tanks. They then reported these manufactured violations to various agencies.

65.     On October 18, 2007, Judge Robert Carter Olson was assigned the 1,100 Acres case. Within days of this event, various state and local agencies began accessing the 1,100 Acres without Conservancy's knowledge or consent.

66.     On or about October 23, 2007, the Enterprise conspired with the following parties: Louie Puroll ("Puroll"), at the time a deputy with the Pinal County Sheriff's Office ("PCSO"); Pinal County Flood Control ("PCFC") administrator Phil Hogue ("Hogue"); Pinal County Environmental Department ("PCED") agent Frank Reed ("Reed"); Arizona State Land Department ("ASLD") Trespass Investigator Bradley Geeck ("Geeck"); and two other agency officials from the US Army Corp of Engineers and the CAP. Without notifying Conservancy and without their permission, Puroll, acting as a member of the Enterprise, led these agency representatives through the destroyed fencing near the South entrance of the 1,100 Acres, next to the posted "No Trespassing" signs.

67.     Immediately after the Puroll-led investigations, Frank Reed of PCED contacted the Arizona Department of Environmental Quality ("ADEQ") to request that it initiate an inspection of the 1,100 Acres for violations. Reed informed Conservancy that Puroll had

contacted Art Carlton ("Carlton"), Manager of Environmental Investigations for Pinal County Public Works, regarding an investigation of the property and that Carlton had sent Reed to meet Puroll on October 23, 2007.

68.     On or about October 30, 2007, Matt Garcia ("Garcia") of ADEQ, attempting to inspect the 1,100 Acres, was unable to locate the property and called Frank Reed, who then called Yendes or Clay Parsons. Clay Parsons arrived with Yendes, who met Garcia and represented himself as the Walker's agent, and escorted him onto the 1,100 Acres through the broken fence and directly to the newly buried diesel storage tanks. Yendes told Garcia the Walkers were leasing the 1,100 Acres to Conservancy. Reed denied knowing Yendes, but Garcia later revealed that it was his understanding that Reed had met Yendes prior to ADEQ's investigation and Yendes had forwarded photographs and his contact information to Garcia, thereby establishing that Yendes was at that time conducting business on behalf of the Enterprise.

69.     On the same day, Joseph Parsons stated to Pinal County Deputy Attorney Husk that he found what may be human remains on the 1,100 acres to falsely accuse Conservancy of a crime and influence Husk to initiate a homicide investigation. The Enterprise used Puroll to allow Parsons full access to the 1,100 Acres. The County Attorney requested Plaintiffs' permission to seize the evidence without a search warrant, which they did not agree to. Puroll seized the evidence without a warrant.

70.     With Puroll facilitating its fraudulently obtained access to Conservancy's property, the Enterprise continued to trespass on the property and escorted two more agency actors, Stephen Ross ("Ross") from ASLD and John Madsen ("Madsen") from the Arizona State

Museum ("ASM"), to the scene of the confiscated evidence.

71.     Despite numerous requests by Conservancy, Puroll never filed a report about the homicide investigation or any actions related to it—thus concealing his and the Enterprise's involvement in this incident. Also, the confiscated evidence eventually disappeared.

72.     On October 30, 2007, Jay Pirouznia ("Pirouznia"), a licensed private investigator, travelled to the 1,100 Acres to witness the execution of the warrant to recover skeletal remains. Husk told Pirouznia the warrant was scheduled to be executed the next day.

73.     On or about October 31, 2007, Pirouznia and an associate traveled to the 1,100 Acres. Prior to their reaching the property, Conservancy's counsel was informed that the search warrant had been served the previous night. Sergeant Hausman admitted the "bones" had not been obtained by way of a search warrant. He further informed Pirouznia that he had the feeling the Sheriff's office was being used as some sort of a tool by the agencies and stated that a report of the incident should be available in about two weeks. Upon observation of the bone site, Pirouznia concluded that the "bones" were planted on the 1,100 Acres by the Enterprise.

74.     Beginning October 30, 2007, for more than two days while the Enterprise was providing these agencies full access onto the 1,100 Acres, once Plaintiffs were denied entry.

75.     On October 31, 2007, Pinal County announced the approval of its 2007–2032 long-term development plan that included two of the largest regional parks in southern Pinal County adjacent, respectively, to two sides of Plaintiffs' collective property. Plaintiffs did not become aware of these plans until 2010. Learning of these plans in the fall of 2007, the Enterprise increased its activity to get the Plaintiffs to cede their interests in the property.

76.     On or about November 1, 2007, John Madsen of ASM, as an actor for the Enterprise, wrote a letter to Elise Moore of PCFC assisting the Enterprise by influencing that agency to take action and investigate Conservancy's use of its property under the guise that the "human remains" were rare Indian artifacts unearthed by erosion.

77.     On or about November 11, 2007, the Walkers, acting on behalf of the Enterprise, acquired voluminous aerial photographs and video of the 1,100 Acres, including Plaintiffs' equipment, structures, and belongings in great detail. These images were submitted, along with specific complaints, to numerous governmental agencies.

78.     On or about November 13, 2007, Joseph Parsons filed a formal written complaint with PCFC's Elise Moore, providing photographs taken by members of the Enterprise during their unfettered access to 1,100 Acres. This second formal complaint led to another investigation of Plaintiffs.

79.     On or about November 20, 2007, Parsons registered with the Pinal County Recorder's Office a Certificate of Water Rights that had been obtained by providing false information to the Arizona Department of Water Resources ("ADWR"). This certificate was awarded to the stockpond located entirely within Parsons' 20 Acres ("Parsons' stockpond"), falsely certifying that it had existed for more than 65 years. The information used to procure the certificate was not for Parsons' stockpond, but was for Tank No. 4, which was located legally on Conservancy's 1,100 Acres. Both the stockpond and its connected channel were built no earlier than1996.

80.     Also, on or about November 21, 2007, Conservancy received a letter from ADWR that addressed additional complaints against them by the Enterprise, who caused Elizabeth

Logan to issue a Notice of Inspection and open another groundless investigation of Conservancy. The Enterprise's influence caused this state agency to temporarily shut Conservancy's operations down and prevent Plaintiffs from discovering the stockpond fraud, thereby enabling the Enterprise to keep this fraud hidden and improperly use it to their advantage in the litigation.

81.     On or about December 2007, the large, heavy, custom-built, and tightly secured doors of Conservancy's nursery were vandalized beyond repair, which, because of the high winds then entering the nursery, caused the failure of the engineered suspension roof structure, all of which rendered the plants inside vulnerable to eventual destruction by sun and winds, and to the cattle that the Enterprise kept pushing onto the 1,100 Acres. The nursery contained tens of thousands of valuable yucca plants and rare cacti that had been an asset of increasing value.

82.     On or about December 2007, two wranglers working for Parsons and therefore the Enterprise herded a hundred head of cattle including bulls onto specific critical areas and then all over the 1,100 Acres, to cause maximum damage to the properties with Conservancy-related persons present—endangering not only property, but also human life.

83.     On or about December 3, 2007, ASLD Trespass Investigator, Bradley Geeck, sent AWD Ranch a warning letter via U.S. mail. This letter falsely parroted the same issues the Enterprise had previously alleged to other agencies—that Conservancy was using an unauthorized route across state lands to gain access to the 1,100 Acres. Attached to this letter was an altered version of the map Lipin had drawn for Yendes.

84.     On or about December 13, 2007, Joseph Parsons admitted to Conservancy's

20

representative that he had PCSO deputies, specifically Puroll, repeatedly facilitate and sanction Parsons' trespass under the pretense of making sure the combination locks on the gates to his easement were working. Parsons said "…because last time I went in I had to get the sheriff to go, and…I got rights to get in there….I don't want to have to keep going through the sheriff."

85.     On or about December 15, 2007, Joseph Parsons made untrue statements to Conservancy that his cattle were not tagged but were only branded, so that Conservancy would not identify that the cattle herded onto the 1,100 Acres through cut fences were his.

86.     On December 19, 2007, in a meeting between PCFC, Plaintiffs, and their counsel, Elise Moore concealed and falsely represented what took place on October 23, 2007 when Phil Hogue of PCFC conducted an investigation on the 1,100 Acres with the aid of Puroll to collect evidence for the benefit of the Enterprise. In an effort to conceal the Enterprise's influence over the agency, Moore falsely stated that no one from PCFC had physically seen the 1,100 Acres, and she reiterated her demand for an onsite visit.

87.     On or about December 23, 2007, Joseph Parsons threatened legal action against AWD Farms if they refused to speak with him and acquiesce to his demands to regarding his access to the 1,100 Acres. AWD Farms had no ownership of the 1,100 Acres.

88.     On or about December 28, 2007, Joseph Parsons trespassed wherever he pleased on the 1,100 Acres and deliberately caused additional damage to the main road and the culverts, by driving his truck over them.

89.     On the same day, Joseph Parsons prevented a diesel fuel delivery to Plaintiffs by confronting and harassing a Union Oil truck driver, accusing him of trespassing and

threatening to discontinue his business relationship with Union Oil unless they ceased delivering to Plaintiffs, which they did. As a result of this interference, Plaintiffs plans were significantly delayed and forced to hire another service at a considerable higher cost.

90.     On or about January 2, 2008, Joseph Parsons harassed the driver from Andy's Mobile Fuel Service about trespassing. As stated to the driver and Plaintiffs' acting manager, Parsons threatened and then followed through by intimidating Andy's into ceasing to deliver fuel. Failure to completely deliver the contract further harmed Plaintiffs' business operations.

91.     On January 3, 2008, the Enterprise directed Elise Moore of PCFC to issue a cease-and-desist letter to Conservancy regarding all work being done on the 1,100 Acres. On that same day, the letter was faxed by Moore's office to Walkers' counsel for his use in the litigation. In the letter Moore repeated the false claim that "access has not been granted to inspect" and she threatened "to gain access through the courts." Plaintiffs had been making attempts to cooperate with Moore.

92.     On or about January 4, 2008, Joseph Parsons made statements on behalf of the Enterprise that if his cattle were not given full access to the 1,100 Acres, the Enterprise would keep the pressure on with legal battles and government agencies taking action against Conservancy. The Enterprise then carried through on these blatant threats.

93.     The following week, the Enterprise wrongfully erected a large gate across Pecan Road and secured the gate so high and tight as to prevent Plaintiffs from opening it. This act was compounded by the Enterprise's later sabotage of the main public road by causing it to flood, and thus denying Plaintiffs access to their properties.

94.     On or about January 6, 2008, Gary Walker sent, via the U.S. Postal Service, fraudulent formal complaint letters to fifteen officials in federal, state, and county agencies, with the intent to deceive. Most of these recipients had previously trespassed on and inspected the 1,100 Acres with Puroll's assistance and without Conservancy's knowledge or consent, and were already listed as Walkers' witnesses.

95.     On or around January 10, 2008, Tom Whitmer ("Whitmer"), of ADWR , self-admitted friend of the Walkers and Parsons, accompanied Joseph Parsons through the 1,100 Acres to conduct an "inspection" of Parsons' fraudulently certified pond. The Enterprise conspired with and/or unduly influenced Whitmer to fabricate violations against Conservancy in preparation for ADWR's inspection of the 1,100 Acres scheduled for the following month.

96.     On or about January 15, 2008, Conservancy received an illegible notice of violation from ADEQ that was prompted by the Enterprise's improper influence. Counsel requested a readable copy from the agency, which was not provided for a month. The notice was written in such a way that the name of the property owner was hidden.

97.     On or about January 21, 2008, Kesselring's KIA Sportage was totaled by criminal damage while parked at a Tempe residence. A report was filed with the Tempe Police. Charron's van was also vandalized that night while parked in front of the same residence. Having only specific vehicles targeted indicates a pattern of destructive conduct most likely perpetrated by the Enterprise.

98.     On February 17, 2008, Loraine Kesselring was assaulted by unknown persons who injured her and damaged two vehicles that were used to travel to and from the properties.

Other vehicles parked at the residence or in the neighborhood were not damaged. Plaintiffs believe, based upon the Enterprise's increasingly destructive acts in a pattern of conduct, that the damage was perpetrated by individuals acting on behalf of the Enterprise.

99.     On or about February 21, 2008, ADWR and PCFC conducted extensive inspections of the 1,100 Acres because of complaints by members of the Enterprise, and on the false basis of Parsons' "certified" stockpond. Whitmer and surveyors conducted the extensive inspection and survey of all the ponds on the properties for ADWR. Conservancy had its expert hydrologist/civil engineer, Allen Gookin ("Gookin"), who is one of the foremost experts on water for this part of the state, on hand to assist and to discuss the positive results Conservancy had achieved in reducing water erosion and solving swamp problems, however, Whitmer refused to speak with him. Whitmer's department in ADWR was not usually given the authority to conduct this type of inspection.

100.   PCFC's Moore and the contract engineering firm with her during the onsite visit refused to engage in any dialogue with Gookin, who was present to provide consultation to the agencies, discuss any findings, or work with PCFC to resolve any issues.

101.   On or about February 29, 2008 and again in March and April 2008, the Enterprise again intentionally herded over 100 head of cattle including bulls, all bearing Parsons' tags, onto the 1,100 Acres, destroying a gate and fencing and putting human life in danger. At considerable expense and effort, Conservancy was forced to hire local wranglers to round up the cattle off the 1,100 Acres to try to minimize the damage to their property and operations. Conservancy's attention was once again drawn away from their businesses.

102.   On or about February 29, 2008, persons acting on behalf of the Enterprise pulled up

and discarded survey stakes on Kesselring's 30 Acres, undoing thousands of dollars' worth of surveying.

103.     On or about March 3, 2008, Plaintiffs contacted PSCO to request a copy of the Sheriff's report for the October 30, 2007 homicide investigation, and were informed that Sergeant Hausman wrote the report on February 4, 2008, over 3 months after Puroll's seizure of evidence. The PCSO forensic analysis revealed that the "bones" were, in fact, two small fragments of animal bone and a small piece of sea shell. Conservancy had been requesting copy of this report for months. *Puroll never wrote a report* nor did he contact Conservancy, although his supervisor, Sergeant Hausman, and the records office reportedly requested multiple times that he do so.

104.     On or around March 13, 2008, Joseph Parsons confronted Conservancy's newly hired caretaker, accused him of a crime, and threatened to have him arrested. As a direct result the caretaker resigned, causing Conservancy another costly rehiring process.

105.     On or about March 14, 2008, Conservancy's representative and a private investigator met with ADEQ representatives and a member of the Arizona Attorney General's Office ("AG") to discuss the fuel tank investigation initiated by the Enterprise. During this meeting it was revealed that ADEQ had concealed the fact that Garcia had been out on Conservancy's property with Parsons and Yendes without Plaintiffs' knowledge or permission. Plaintiffs learned about the Enterprise's misrepresentations to ADEQ and Garcia's interactions with Reed, Yendes, and Clay Parsons. Two months of ongoing communications, legal fees, site visits, meetings, hiring a private investigator, and the significant cost to restore the tanks to their original condition, depleted Conservancy's

resources. In April 2008, the ADEQ investigation was closed with no violations noted.

106.    On or about March 16, 2008, Conservancy discovered dirt bike tracks leading up the large shop/warehouse, and that an attempt had been made to cut the large padlock off the shop doors for the purpose of breaking and entering and theft. The tracks matched those left behind during the previous week by Joe Parsons Jr. and a second dirt bike rider, who had been observed and confronted about riding all over the 1,100 Acres.

107.    On or about March 24, 2008, Joseph Parsons called Conservancy to complain that cowboys were harassing his cattle and that he would be on the property with authorities. Clay Parsons, acting on behalf of the Enterprise, confronted a contractor working for Conservancy onsite and falsely accused him of a crime for guiding trespassing cattle off the 1,100 Acres without a permit. Conservancy immediately verified, by calling the Arizona Department of Agriculture ("ADA"), that no permit was needed to remove trespassing cattle and then informed the contractor. That night the contractor received a call from a third party with whom he had a fencing contract, who told him he would lose his contract and other ranchers' fencing work unless he "quit what he was doing." The contractor immediately ceased working for Conservancy and withdrew his bid to construct fencing on the 1,100 Acres, saying that he was very sorry, but that he "could not afford to be blackballed" in the ranching community. Parsons knew this contractor and that he was working for Conservancy. This interference delayed the completion of critical fencing for proper business operations on the property and also caused Conservancy to have to find and hire other wranglers to assist in removing trespassing cattle.

108.    On or about March 25, 2008, the Enterprise faxed the invalid Walkers-Parsons

contract to the ADA to adversely affect Conservancy. As a result, an agent of the ADA, Brad Cowen ("Cowen"), inspected the 1,100 Acres. Cowen identified the ear tags on the trespassing cattle as belonging to Parsons. After the inspection Clay Parsons confronted Cowen just outside the main entrance, again presented his invalid contract, and stated that he would cut fences and do "whatever it would take" to get his cattle to his water and that he was doing so upon his attorneys' advice. Parsons told the agent that Puroll was aware of the problems on the 1,100 Acres, implying that there were law enforcement issues and further revealing Puroll's involvement in the Enterprise.

109.    On or around March 30, 2008, just days after Clay Parsons' threat, the Enterprise committed acts of vandalism on the 1,100 Acres. The main South gate and lock were severely damaged and three internal gates were destroyed. Accessing the property required the vandals to enter through locked gates with the combinations known only to Plaintiffs and Joe Parsons. The damage required extensive repairs and made the property vulnerable to more cattle damage and trespass.

110.    On or about April 7, 2008, Elise Moore issued a PCFC report containing an extensive task list that would have required Conservancy to expend large amounts of money to fulfill her requirements, some of which were abjectly impossible, and all of which were out of scope of her or PCFC's authority. This report was in response to Gookin's March 11, 2008 Report/Application for the Flood Plain Permit he submitted per PCFC's guidelines provided to him during the inspection. According to the Pinal County Flood Ordinance itself, Gookin concluded no permit was required for the work Conservancy had done because the activity was well outside of the McClellan floodplain as defined by FEMA.

27

Also, the permit process generally did not apply to the work being done because there were no activities that are normally considered floodplain management, and the activities did not divert, retard, or obstruct flow by more than 12" within the floodplain as a whole.

111.    On April 17, 2008, Conservancy's counsel met with PCED and the county attorney to determine who from PCED went onto the 1,100 Acres with Puroll and how the matter was referred to ADEQ. Puroll's presence had been specifically requested and confirmation received. PCED had disclosed that Puroll was the person who initially contacted the department's manager regarding the investigation. Puroll failed to appear at this meeting, further hindering Conservancy's defense against additional legal action.

112.    On or about May 30, 2008, realizing that Defendants were committing acts of racketeering, Conservancy moved the court for protection and sanctions from the numerous and ongoing egregious acts by Walkers/Parsons, which were outlined in two Order to Show Cause Motions in CV 2004-01368 for bad-faith litigation.

113.    On or about June 6, 2008, during Conservancy's first hearing before Judge Olson, he stated he did not think Conservancy would be successful in arguing the Motions before him. He twice "encouraged" and once "suggested" that Conservancy reconsider proceeding with the Show Cause Motions or could face sanctions if they were not withdrawn. Under duress, Plaintiffs withdrew their motions with nowhere to turn for protection from the Enterprise.

114.    On June 19, 2008 the court-ordered inspection of the 1,100 Acres took place. Walkers filed a Motion to Compel Entry and falsely represented to the court that they had not previously inspected the 1,100 Acres despite evidence of illegal inspections and photos taken that were outlined in Plaintiffs' OSC Motions. The parties agreed upon the date for

the inspection even though the Motion to Compel had not been ruled on. The opposing

parties and attorneys present were photographing not just the land and buildings, but all of

the equipment, supplies, materials, and belongings, despite the fact that the lawsuit involved

issues dealing only with the real property.

115.    On or about June 23, 2008, Paul Loucks appeared in the Parsons-Fidelity case and

represented to the judge that there existed a parallel/companion/related case in Pinal County

that had a pending Motion for Summary Judgment filed by Parsons. No such motion was

pending. Counsel for the parties agreed to vacate the November trial date.

116.    On or about June 25, 2008, MC&R disclosed the Fidelity lawsuit by burying

mention of it in Parsons' 7th Supplemental Disclosure to Conservancy. This mention was

not a full disclosure.

117.    On or about July 1, 2008, attorneys Cohen and Loucks on behalf of the Enterprise

mailed to DPC/Ranch's counsel a copy of Parsons' Motion for Summary Judgment,

containing a material misrepresentation that the Certificate of Grandfathered Water Rights

Parsons purchased from Walkers to the Parsons' stockpond was originally issued in 1946.

In fact, the certificate referenced a pond in Section 20, "Tank No. 4" that was legally owned

by Conservancy. Also attached was a map illustrative of the easement's roads and trails.

118.    Also on or about July 1, 2008, attorneys of record, Cohen and Loucks on behalf of

the Enterprise, mailed an affidavit by Defendant Brimhall attached to a copy of Parsons'

Motion for Summary Judgment to DPC/Ranch's counsel. Brimhall knowingly signed the

false affidavit written by Cohen to be submitted with the motion, and knew or should have

known that this document could/would be mailed in furtherance of the fraudulent scheme.

119.     In or about July 2008, Conservancy's main generator was vandalized and damaged beyond repair. The 1,100 Acres are completely off-grid and uninhabitable without electricity in the summer heat. As a result Plaintiffs' caretaker quit because of the intolerable living situation, leaving the property open to additional criminal activities. Conservancy then discovered that the blade had been stolen off its tractor and an ATV was badly damaged. Because of the Enterprise's prior threats and actions, and the improbability of anyone else having access or motive, Plaintiffs allege the Enterprise perpetrated these acts of vandalism and theft.

120.     In anticipation of the first major decision by the new judge in the 1,100 Acres case, after working in concert against Conservancy for almost a year the Walkers and Parsons negotiated a private settlement agreement that was announced in Court on August 8, 2008. The attorneys for both parties refused to disclose this agreement, despite discovery requests by Conservancy's counsel.

121.     On or about August 19, 2008, ADWR lodged a written Notice of Violation against Conservancy. No further action by ADWR ensued. No further action ensued with PCFC.

122.     On or about August 21, 2008, DPC/Ranch filed a Rule 56(f) motion requesting time to depose Parsons' three experts prior to the summary judgment hearing. Because Judge Olson failed to rule on this motion, it was deemed denied.

123.     On or around September 10, 2008, based upon Parsons' and their attorneys' misrepresentations to the Court concerning the fraudulently certified stockpond, the Court granted Parsons' Motion for Summary Judgment. Without considering DPC/Ranch's evidence, the Court agreed with Parsons' argument that the purpose of the easement was for

the movement and watering of cattle at Parsons' stockpond. It effectively rendered the 1,100

Acres unusable for Plaintiffs' purposes and useable only by the Enterprise. The Court

reasoned that Plaintiffs should have known about the scope of the easement from the time of

the purchase of the properties, against much contrary evidence and without adjudicating the

matter. The Court improperly overturned Judge O'Neil's May 5, 2005 ruling, thereby

effectively eliminating Plaintiffs' claims of fraud, breach of contract, and negligent

misrepresentation against Walkers. At the same hearing, Cohen objected to Conservancy's

request to amend their complaint. The Court gave the Parsons and Walkers permission to

amend their complaints, but required DPC/Ranch to file a Motion for Leave to Amend.

124.    On or about September 18, 2008, in Parsons' Second Amended Complaint, Parsons

and attorneys of record, Cohen and Loucks, alleged wrongful diversion and unlawful

appropriation of water and two other counts based on the illegally certified stockpond and

fraudulent superior water rights created thereby. The new causes of action were against

Conservancy and newly named defendant AWD Farms LLC, the investors for DPC/Ranch

and, later, investors for Kesselring. These misrepresentations in the Amended Complaint

allowed the Enterprise to bring Farms into the 5-year-old case.

125.    On or about October 22, 2008, having received no response from the Court,

Conservancy reasserted its Motion for Leave to Amend its complaint originally filed on

September 9, 2008. On October 31, 2008 Parsons filed a Response to Conservancy's Notice

to Reassert. The Court did not rule on these motions until March 2009.

126.    On or about November 19, 2008, Cohen revealed the earlier misrepresentations

regarding the easement in a letter to DPC/Ranch's counsel, stating that he had attached to

the letter a map with the "real" location of an easement trail, and admitting that the map

presented to the Court with the September 2008 summary judgment was false. The exposure

of Cohen's misrepresentation came two months after the judge had relied on it to rule in

favor of Parsons' motion. This material misrepresentation before the court was not just an

error. Cohen made no effort to attempt to have the Court's decision based on the

misrepresentation reversed. Furthermore, he argued against DPC/Ranch's multiple requests

for reconsideration and a new trial, which Judge Olson denied.

127.    On November 26, 2008, AWD Farms filed its answer to Parsons' amended

complaint as well as a peremptory challenge to Judge Olson pursuant to A.R.S. §12-409.

128.    On November 28, Judge Olson referred the challenge to the Presiding Civil Judge,

but not before first adding his commentary that he had "ruled on many substantive matters

in this case, including motions for summary judgment" (in fact, only one), that he was

uncertain as to whether AWD Farms was "a *jural* entity or the nature of its relationship to

this litigation and any existing AWD [Ranch] defendants", and that "[i]t is unclear, and not

determined by this Court, whether this *Notice* is well taken."

129.    On or about December 1, 2008 after being brought into the Pinal County lawsuit,

AWD Farms sued Conservancy for breach of contract and the inability to repay the

investors, which was directly caused by the Enterprise's continuous business interference.

130.    On or about December 18, 2008, Cohen sent a letter to counsel for Conservancy that

the Parsons intended to put cattle out onto the properties on January 1, 2009, and demanded

that the easement roads and trails be left open for the cattle. The location and width of the

easement had still not been determined, and there was no signed judgment from the

32

September summary judgment ruling. Parsons filed an OSC Motion to put cattle out, and DPC/Ranch filed for a TRO to prevent the cattle from free access to the entire 1,100 Acres.

131.    On or about December 19, 2008, three months after Judge Olson ruled on Parsons' Motion for Summary Judgment, he allowed DPC/Ranch to take a belated deposition of Brimhall. Yendes again traveled to Arizona and attended Brimhall's deposition at the office of MC&R. Conservancy objected to Yendes's presence as a non-party to the case, and was informed that Yendes was present officially as Walkers' representative. Under oath, Brimhall admitted he did not write his affidavit that was submitted to the court by MC&R. Brimhall's deposition testimony contained statements that directly contradicted his sworn affidavit. He also admitted 1) to false testimony to the Court, 2) that the affidavit was false, 3) that he was unable to determine the location of the easement in the manner set forth by the rules of the Arizona State Board of Technical Registration, and 4) that, therefore, he was in violation of those rules in submitting his affidavit to the Court.

132.    Also in January 2009, AWD Farms learned of Enterprise's interference in an unrelated lawsuit it was party to in another county. The Enterprise or their agent called the opposing attorney with a false allegation to materially impact Farm's defense, further interfering with Farms' business and legal matters, costing it additional attorney fees, and weakening Farms' negotiating power towards settlement in that case.

133.    During a January 23, 2009 status conference, Cohen and Loucks made false representations to the Court that Brimhall knew where all the roads and trails were and that he was the qualified expert as to the location of Parsons' easement, despite the direct contradiction of their statements to Brimhall's deposition testimony. DPC/Ranch opposed

Brimhall's participation but Cohen and Loucks successfully fought to have him named the authorized expert. The Court ruled that Brimhall should have access to the properties to perform a new survey to specify the location of the road and trails.

134.    Also at the conference, Cohen argued for mandated enforcement of the Court's unsigned September 10, 2008 ruling, allowing Parsons' free-roaming cattle open, unfenced, and un-gated ingress and egress easement across undefined roads and trails.

135.    Conservancy filed a second Emergency TRO regarding Parsons' survey request because the Court had not ruled on Conservancy's request that it determine the propriety of Brimhall as Parsons' surveyor and expert witness and that it strike his testimony for making false statements and misleading the Court, and conflict of interest. The Court denied the TRO and upheld Parsons' right for their cattle to have access to the easement.

136.    Conservancy then requested an emergency motion for a stay on the ruling and further proceedings pending their Special Action, and/or that the Court clarify the January 23 ruling for which there was no written minute entry. The Court did not respond to the stay request, and so counsel for Conservancy filed its Special Action with an emergency request for stay of the Court of Appeals. During the telephonic hearing before Division Two on or about February 2, 2009, Cohen, in direct contradiction to his earlier sworn statements, said that it was too late for Parsons to put cattle out on the 1,100 Acres. Parsons' OSC Motion had not been withdrawn and at no time did Cohen notify DPC/Ranch of any change of intent until the telephonic conference before Division Two. Division Two denied the stay.

137.    On March 3, 2009, the Court of Appeals declined to accept jurisdiction of the Special Action but granted attorneys' fees to Parsons. Judge Olson cited the sanctions by the

34

Court of Appeals at least five times in hearings and minute entries, as a basis for denying Conservancy's right to be heard, even using it in a completely separate case against Kesselring to justify denying her rights in a quiet title action.

138.     Parsons and Walkers had failed to respond to Conservancy's NUIs or requests for production concerning their confidential settlement but on the same day, February 27, 2009, using identical language, both objected to any inquiry into the settlement between them on the grounds that the information requested was inadmissible into evidence in this or any lawsuit by reason of Rule 408 of the Arizona Rules of Evidence.

139.   On or about March 9, 2009, the Court issued the next in a series of rulings based upon false representations by Parsons and its counsel that the Court relied upon in interpreting Parsons' easement. Consequently, Conservancy's counts against the Walkers for Consumer Fraud and Negligent Misrepresentation were dismissed. Based upon the reason that Conservancy "should have known" the deed of easement was an easement for cattle to get to the certified stockpond on Parsons' 20 Acres, the Court contradicted Judge O'Neil's 2005 ruling. Cohen and Loucks made a material misrepresentation to the Court by stating that the normal adjudication process concerning Parsons' water claims did not apply because Parsons' stockpond was certified prior to 1977. As a result, the Court denied DPC/Ranch's Motion to Dismiss and agreed to accept jurisdiction to enforce Parsons' established right over the pond.

140.     Despite reminders of its pending motion, Judge Olson denied Conservancy's Leave

to Amend because of its "dilatory motive" on March 9, 2009[3], six months after it was filed.

141.    On or about April 1, 2009, Plaintiffs DPC and Ranch were forced to file for Chapter 11 bankruptcy because of the prodigious amounts of time, energy, and money lost to dealing with the ongoing pattern of interferences by the Enterprise.

142.    On or about May 15, 2009, another act of misrepresentation and fraud by Cohen was revealed. Cohen disclosed a Pasture Agreement and then "damage claims." These damages for not being able to put out cattle were declared to have been incurred *at the same time* that, according to Cohen's earlier declaration to the Appellate Court the same Court that it was "too late" to put the cattle out.

143.    On or about June 8, 2009, Allen Gookin discovered seemingly irrefutable satellite proof that Parsons' stockpond *did not exist any earlier than 1996.* Gookin further discovered that there was indeed a stockpond in the immediate area that had existed since 1946, but that this pond was actually legally located *on Conservancy's property*. Even further, Gookin discovered that Parsons had been stealing water from Conservancy's pond since they purchased their property. Gookin's affidavit specifically concluded: "Any person making the assertion that Parsons' Pond is related to the water right contained under Certificate of Water Right 1421 is misrepresenting a material fact."

144.    On June 15, 2009, one day before a status conference, AWD Farms filed its Motion

---

[3] Every matter submitted to a judge of the Superior Court for his decision shall be decided within sixty days from the date of submission thereof. The Supreme Court shall by rule provide for the speedy disposition of all matters not decided within such period. (Arizona Constitution, Article 6, Section 21 and The Arizona Code of Judicial Conduct, Canon 2, Rule 2.5, Comment 5).

for Summary Judgment in which Gookin's report of evidence of the stockpond certification fraud was presented for the first time.

145.    At the June 16, 2009 telephonic status conference, the judge addressed "Mr. Louck's oral motion to bifurcate" the trial issues. Counsel for both Conservancy and AWD Farms objected to the bifurcation; they had no time to prepare for this issue. The Court prevented further discussion by ruling to bifurcate Parsons' water claims into a separate trial, acting in violation of the Rules of Civil Procedure by denying DPC/Ranch and Farms the right to file pleadings with the Court prior to its decision on such an important issue. Also the Court ruled against DPC/Ranch's Motion for Clarification and/or Reconsideration of Parsons' summary judgment including the misrepresentation of the two conflicting easement maps.

146.    On or about June 22, 2009, Brimhall defied the Court's order that he physically perform the survey of Parsons' easement. Instead, Joseph Parsons led two workers from Brimhall's company around the 1,100 Acres, pointing out to them where to mark the road and trails of his easement. Kesselring witnessed the "survey" and took photographs. During the conversation with Parsons, he said he recognized her but did not know her name. She then became a new target for the Enterprise, as evidenced by the acts against her. This new survey was the third easement location presented to the Court by Cohen and Loucks, with each location becoming increasingly advantageous to Parsons.

147.    On or about June 23, 2009, DPC/Ranch argued before the Court on its motion to disqualify JE Fuller ("Fuller"). Included under seal was Lipin's affidavit. Cohen and Loucks had misrepresented to the Court that there was no conflict of interest when they hired Fuller and that MC&R had not been privy to any information that would be prejudicial against

DPC/Ranch. Fuller had been employed by DPC/Ranch and when DPC/Ranch subpoenaed its records, Fuller sent them to MC&R. The Court denied DPC/Ranch's motion and ordered the portions of Lipin's under-seal affidavit detailing corruption and strategies about the case to be disclosed to Walker and Parsons.

148.     In June and July 2009, Plaintiffs contacted numerous buyers at nurseries in California and New Mexico to purchase Plaintiffs' yucca plants. Conservancy was unable to transport the plants off the properties and lost the sales when Plaintiffs' bridge was washed out by the intentional water diversion by the Enterprise's interference.

149.     On or about July 8, 2009, Loucks called counsel for AWD Farms and stated that Parsons intended to immediately stipulate to dismiss AWD Farms from the 1,100 Acres case with prejudice, because Parsons could not defeat the summary judgment motion. With AWD Farms' disclosure of Gookin's report, the Enterprise's plan to pursue damages against AWD Farms ended abruptly. With a dismissal Parsons could avoid litigating the motion because exposure of the fraud could completely turn around Conservancy's case against the Enterprise. The Court signed the dismissal on August 5.

150.     On or around July 9, 2009, Conservancy propounded non-uniform interrogatories to Walkers and Parsons that specifically asked them to describe the circumstances surrounding the origin and certification of the stockpond located entirely on Parsons' 20-acre parcel. Responses were due August 24. Walkers and Parsons did not reply.

151.     On or about August 3, 2009, AWD Farms was granted a judgment against Conservancy, jointly and severally. Through no fault of their own, AWD Farms had been dragged through almost a year of baseless litigation by the Enterprise. The result of the

Enterprise's fraudulent representation and extreme legal harassment, coupled with its other overt business interferences and unlawful acts, caused the ventures AWD Farms had invested in to fail. Conservancy settled the lawsuit with AWD Farms for damages suffered resulting from the loss of monies it invested. The damages were levied as a recorded and enforced judgment against Conservancy in the amount of $1,800,000 plus interest after 30 months.

152.     On or about August 5, 2009, Judge Olson held a hearing on the Walkers' Motion for Summary Judgment and ruled from the bench in favor of the Walkers, ordering foreclosure on the property. Judge Olson issued an order striking Conservancy's entire response to Defendant Walker's Motion for Summary Judgment based on a single disputed fact that he held to be a misrepresentation, specifically that Pierron and Lipin did not intend to cross-guarantee each others' notes on the 1,100 Acres. Despite Conservancy's denial of any misrepresentation, Judge Olson deemed the entire Response, Separate Statement, and evidence submitted therewith not in compliance with Rule 11, without review of the complete response.

153.     At this hearing attorneys for the Walkers and the Parsons revealed part of the confidential Walkers-Parsons settlement—that Parsons' easement would no longer be in existence if Walkers regained the land back.

154.     As soon as the ruling against Conservancy was issued from the bench, with the Court's aid, Cohen and Keating launched into settlement negotiations for which they were completely prepared. Cohen and Keating proposed long lists of well thought-out concessions their clients wanted, including Conservancy giving up its right to appeal the

rulings and any right to a redemption period. They even had an agreement in place with an environmental company to inspect the property the very next day. Conservancy's attorney was not anticipating any settlement. In fact, Pierron and Lipin were not even present.

155.    During August 2009, after foreclosure of the 1,100 Acres had been ordered, the Enterprise continued to harass Conservancy to interfere with their winding up business and moving off the properties. On several occasions after the order, from August to October, multiple witnesses observed Parsons and Yendes trespassing and taking pictures of all valuables on the 1,100 Acres. After AWD Farms moved some of its assets from the 1,100 Acres to the 30 Acres, 1½ pallets of new T-posts and other fencing materials were stolen, and later the glass door on the tractor was destroyed. The special order and installation of the new door delayed business operations.

156.    On or about August 11, 2009, the Enterprise unduly influenced Bill Webster ("Webster") of the Trespass Department of ASLD to take action against Kesselring, ordering her to complete an archaeological survey. The survey showed no indication of or disturbance of artifacts anywhere near the road that she was merely traveling over. Even though Parsons had done extensive work on the roads surrounding and leading up to the road in question, ASLD did not require Parsons to conduct a survey.

157.    On or about August 12, 2009, in an email to Conservancy's counsel, Keating demonstrated to Conservancy his certainty that the Judge was on his side, stating "I am prepared if necessary to file an emergency application with Judge Olson to force your clients' compliance with any reasonable requests that we make. He will not have any patience for your clients interfering with the Walkers' rights."

158.     On or about August 14, 2009, Keating again emailed Conservancy's counsel stating that "Walkers will be exercising their rights under the four Deeds of Easement to immediately secure the property and, as soon as they can, will block off that roadway [the road and bridge into the property]…"

159.     On or about the morning of August 16, 2009, Joseph Parsons stated to Conservancy that he was acting as the agent for the Walkers and, along with others, erected a fence *on* Kesselring's 30 Acres, blocking her access to it and the exit of workers. In a further act of intimidation by the Enterprise, Parsons videotaped the entire incident and also removed property line stakes. The fence the Enterprise erected was clearly on Kesselring's property, and it constituted trespass and false imprisonment.

160.     On or about August 23, 2009, Conservancy discovered that the bridge over its main access road had become washed out, eliminating any entry into or exit from the 1,100 Acres. Upon investigation, Conservancy discovered that a retention pond's berm had been breached, apparently deliberately to create a large channel that diverted massive volumes of fast-moving water straight to the bridge. This main access road bridge was Conservancy's only full-time legal access and a critical part of Kesselring's easement to her 30 Acres.

161.     On August 24, 2009, Keating emailed Judge Olson with an attached proposed form of judgment inaccurately memorializing Judge Olson's August 5 ruling including relief not requested in the Walkers' summary judgment motion involving Kesselring, a non-party to the case. The email was the equivalent of an *ex parte* brief and excluded Conservancy from the opportunity to respond and without benefit of a noticed motion. The proposed judgment requested the Court take action outside of its jurisdiction and void Kesselring's easement.

162.    On or about August 26, 2009, Kesselring began repair of the bridge that was necessary for her access to her easement and property. A low-flying plane flew directly over the area twice, and later the same day Conservancy's counsel received an email from Keating, demanding that no repair of the bridge or berms be performed. Prior statements about Conservancy's work damaging the property had been submitted in agency complaints. In contradiction to Keating's earlier declarations on behalf of Walkers, Keating's email now claimed that Conservancy's work had added value to the land by stating, "...and, anyway, those dams and ponds should probably be classified as fixtures and permanent improvements similar to fences and buildings."

163.    On or about September 2, 2009, in an email to Conservancy's counsel, Keating, stated that Joseph Parsons (or his representative) was a full agent of the Walkers relative to the properties, thereby confirming that the acts by Parsons were acts by Walkers including unlawful activities that blocked Kesselring's access and falsely imprisoned people. This admission of complicity confirmed to Plaintiffs that the Enterprise's unlawful acts were fully known by the attorneys for Walkers and Parsons.

164.    On September 3, 2009, Loraine Kesselring filed a Verified Complaint (Quiet Title), naming DPC, Ranch, Walkers, and Parsons Defendants because access to her 30 Acres had been blocked by the Enterprise and by the deliberate destruction of the bridge she used as a vital part of her easement. She also filed a Notice of Change of Judge, pursuant to Ariz.R.Civ.P., Rule 42(f)(1)(A), from Judge Olson.

165.    On or about September 8, 2009, Plaintiffs discovered on Parsons' state-leased land just South and next to the 1,100 Acres a huge, newly dug pond and new roads with

42

irrigation hoses in ditches that been engineered to divert water to wash out Pecan Road during rains, to prevent DPC/Ranch's access. Also discovered was the equipment used for this construction project, which matched what was used for the water diversion that washed out DPC/Ranch's bridge. Parsons had not disclosed this construction project or its effect on the argument that Parsons' cattle had no water without access to its stockpond.

166.    On the same date, Loucks attempted to negotiate a stipulated judgment between Parsons and DPC/Ranch. He made a request through counsel that DPC/Ranch not only give up their right to appeal, but also stipulate not to bring RICO or other associated claims against the Enterprise.

167.    On September 8, 2009, Judge Olson issued a Notice remanding Kesselring's matter to Presiding Civil Judge William J. O'Neil to make the determination whether the Notice of Change of Judge was well-taken, and listing reasons why he had not determined whether the Notice was good and proper. Judge Olson improperly recommended further inquiry to determine whether Kesselring was entitled to the relief requested. In his argument about Kesselring, Judge Olson stated that he had not been informed prior to his August 5, 2009 summary judgment ruling that Conservancy had granted a "putative easement" to Kesselring, the subject of her Complaint for Quiet Title and ordered the Notice be distributed to all counsel in CV2004-01368.

168.    On or about September 15, 2009, Kesselring in CV2009-03687 filed an affidavit for change of Judges for cause regarding Judges Olson and O'Neil. In her Affidavit, Kesselring requested a neutral Judge and preferably that her case be transferred to Maricopa County to avoid any potential conflicts.

169.    On September 21, two weeks after Judge Olson had issued his Notice, Judge O'Neil sent the change Affidavit to Judge Stephen McCarville, also a Pinal County Superior Court Judge, to determine its propriety.

170.    On or about September 22, 2009, Kesselring hired Gookin to investigate the damaged bridge; Gookin reported that water had been diverted, that the washout was not caused by natural causes, and that the volume of water diverted presented a dangerous and *possibly fatal threat* to anyone around the bridge. Gookin also inspected the ditches dug to Pecan Road and determined them to have been designed to deliberately wash out Pecan Road during the same rainstorms that washed out the bridge.

171.    Soon after Kesselring disclosed the hydrology report, Conservancy was able to pinpoint the most likely days when the berm was breached and the canal dug. Plaintiffs allege that the Enterprise watched for a window to illegally enter the 1,100 Acres with equipment to accomplish the setup for the bridge destruction. The bridge had previously easily withstood the effect of 3–4 times the rainfall, but could not withstand the force of the water deliberately diverted to it.

172.    On or about September 25, 2009, Loraine Kesselring's first well was drilled on the 30 Acres. During the same time frame, a pallet of chain link fencing materials was stolen.

173.    During September, October, and November 2009 in the Parsons-Fidelity case, Fidelity was precluded from discovering the following regarding that case: 1) whether Parsons was receiving free, reduced-rate, or contingency representation from Cohen or MC&R and 2) whether Rothschild had filed a malpractice report or claim. Fidelity was also not permitted to present expert testimony regarding malpractice by Rothschild.

174.    In or around October 2009, within 4–6 weeks after Plaintiffs' valuable copper cabling had been moved to Kesselring's 30 Acres (which the Enterprise photographed) it was stolen. An insurance claim filed for this loss combined with additional claims filed because of presumably Enterprise-caused destructive acts caused the investors' insurance policy to be cancelled. The theft was reported to PCSO, but Puroll's influence ensured that no investigation would take place. The Enterprise had already admitted a *de facto* claim to the ADA agent the previous spring that Puroll was working for them.

175.    In the Parsons-Fidelity case, on or about October 5, 2009 Cohen disclosed to Fidelity's co-counsel Laura Kam ("Kam") that the Walkers-Parsons confidential settlement involved the conveyance of a new, preferential easement if Walkers won their summary judgment in Pinal County.

176.    On or about October 5, 2009, Steven Rensch noticed his appearance in the 1,100 Acres case and immediately filed an Objection to the Proposed Order, in order to attempt to undo the unlawful settlement agreement entered into at the August summary judgment hearing. Rensch also argued against Walkers' insertion of language into the proposed order deciding the legality of the 30 Acres case, which was not a subject of the 1,100 Acres case.

177.    On October 12, 2009, Keating emailed Kesselring a copy of his Reply re Judgment that he emailed to Judge Olson in the 1,100 Acres case, giving the reasons why he thought the Court would not grant Kesselring an Easement by Necessity and urging Judge Olson to nullify her easement, which had been recorded on July 23, 2009.

178.    After two days of hearings, on October 13 and 14, 2009, and after the first and only testimony in the entire case by Conservancy's members, the Court granted a motion to

vacate a stipulated settlement entered into on August 5, 2009. After Rensch's strong argument that the settlement did not adhere to the law, the Court found the stipulation entered into on August 5, 2009 was not enforceable because Conservancy's former attorney had neither direct nor express authority to enter into it. However, the Court later reversed this ruling, with no explanation.

179.    The Court failed to provide timely notice to Kesselring of the hearing in her case on October 16, 2009, and because she did not attend, she lost the action. The Court refused to reset the hearing and sanctioned her for non-attendance. The lack of proper notice in Plaintiffs' cases shows a pattern of due process and civil rights violations.

180.    On October 22, 2009, Loucks emailed Kesselring objecting to her change of judge request and, in what she perceived as an attempt to intimidate, informed her that they knew the location where she lived in Tempe, by asking her whether they should send legal documents there rather than to her post office box.

181.    In the Parsons-Fidelity case, on or about October 28, 2009 during the deposition of Joseph Parsons, Cohen refused to allow Parsons to answer Kam's questions about the settlement and falsely stated that Judge Olson had issued an order prohibiting Parsons from disclosing the terms of the settlement. Kam requested a copy of that order, but Cohen did not produce it so Kam filed with the Court to compel its production. This order did not exist.

182.    In the Parsons-Fidelity case, on or about November 2, 2009 Kam restated to Cohen via email the following: 1) his reasons besides the aforementioned one for refusing to let Joseph Parsons discuss the Parsons-Walker agreement: its irrelevance plus keeping it secret from DPC/Ranch, and 2) what he and "PJ" had told her about the agreement: if Walker got

46

the property back no money would exchange hands and the location of the easement would change. Kam also agreed not to transmit the settlement agreement to DPC/Ranch or their counsel, if Cohen would let her see it. The email thread continued, in attempt to reach agreement regarding Kam seeing the settlement. On November 3 they reached an agreement, but on November 4 Cohen imposed additional terms and restrictions.

183.   In the Parsons-Fidelity case, on or about November 4, 2009 Kam moved the Court to compel the secret Walkers-Parsons settlement agreement. Among her reasons were that Parsons was seeking a double recovery through multiple actions and that Parsons was seeking the same damages in the 1,100 Acres case as in the Fidelity case.

184.   In the Parsons-Fidelity case, on November 13, 2009 Judge Borek ordered from Parsons for the in camera inspection a copy of the Pinal County case complaint, its status, **verification that all parties to the Pinal County case are part of the settlement** (emphasis added), and any order relating to the Walker-Parsons settlement agreement. There is no indication that Cohen/MC&R provided any of the requested information to Judge Borek.

185.   In the Parsons-Fidelity case, on November 24, 2009 a Ruling issued by Judge Ted B. Borek, Pima County Superior Court, states in pertinent part:

> On November 23, 2009, this Court discussed the status of the settlement with Judge Robert Carter Olson, the judge presiding over the case in Pinal County. Having considered these matters, the Court finds that the Settlement Agreement may lead to discoverable information.

186.   The settlement agreement was ordered to be provided to Fidelity under the terms of a protective order that limited use of the agreement to attorneys and persons involved with the

Fidelity case. Nowhere in the record of the 1,100 Acres case was this communication between Judge Olson and Judge Borek revealed, even though their conversation must have involved issues of some relevance, if not outright dispute, among the parties. Not only was Judge Olson's discussion with a Judge in another case, it was with a Judge in another county altogether. What Judge Olson said to Judge Borek was *ex parte* in that anything that was communicated had an effect on the Judge and needed to be revealed to the parties.

187.    On or about November 25, 2009, 93 days late, attorneys for Parsons mailed to Rensch unverified responses to DPC/Ranch's NUIs. Parsons perpetuated the stockpond lie by producing documentation for certified water rights that they knew to be fraudulently obtained. MC&R were culpable because they were involved in the preparation of the paperwork that was in large part the basis of this case, and knew or should have known that by submitting responses denying any knowledge of the construction of the stockpond, they were participating in the Enterprise's concealment of this fraud.

188.    On or about November 30, 2009, 98 days late, Keating mailed to Rensch Walkers' fraudulent, unverified responses to Conservancy's interrogatories, in which Walkers asserted that they knew nothing about the planning, construction, or certification of Parsons' stockpond and its channel, and that these were already in place when Walkers purchased Section 20 "in the 1970's".

189.    Shortly after the summary judgment ruling in favor of the Walkers, on several dates from August until the first part of December 2009, counsel for all parties held work sessions with Judge Olson in an attempt to define the Rule 54(b) judgment. The judgment attempted to memorialize Judge Olson's September 2008 rulings to the effect Parsons' easement

permitted the movement of cattle to Parsons' 20 Acres for the purpose of watering them at the certified stockpond. However, the discussions about proposed judgment did not address the questions of the easement's location and dimensions that had never been argued or decided, and was not, therefore, a subject of the judgment.

190.    On December 1, 2009 Counsel for Conservancy filed a Motion for Clarification asking the Court for a clear and complete description of the specific issues that would be before the Court in "Trial 1" and in "Trial 2".

191.    On December 3, 2009 Rensch objected to the *ex parte* communication in which staff for Cohen/Loucks/MC&R provided Judge Olson's staff with a survey map and legal description to be attached to the Rule 54(b) judgment. Rensch also objected to this attachment stating that not only had the location and width of the easement never been decided, but the legal description had not been defined by Brimhall, as ordered by the Court. Judge Olson ignored Rensch's objections and used this map and description, not conducted until ten months *after* his ruling, to help explain his September 2008 ruling. At this hearing, Rensch again requested from the Court clarification of the trial issues. The Court declined to issue clarification and directed the parties to meet and confer to decide what issues would be before the Court. Opposing counsels for Walkers and Parsons did not respond to counsel for DPC/Ranch's requests for clarification. After Rensch's objections, Judge Olson directed counsel to cease using emails as a form of communication with the Court.

192.    On December 7, 2009, Judge Olson prepared a judgment that was, according to Court records, filed on that day. No minute entry was issued and the judgment was not served on any of the parties as required by 17C A.R.S. Super. Ct. Local Rules, Pinal

County, Rule 2.4.[4] The Rule 54(b) judgment was limited in scope and nature, and Plaintiffs did not determine until the filing of their appeal that the judgment was not a final judgment on the merits.

193.    On or about December 18, 2009 attorneys' bills disclosed by Keating included entries indicating that Parsons received a *minimum* of 100 deeded acres of land in the confidential settlement deal with Walkers. The billing statements also revealed extensive telephone and email communications between Keating, Gary Walker, and Yendes.

194.    Also on December 18, 2009 Judge O'Neil denied Kesselring's Motion for Stay Pending Special Action, the same afternoon it was filed, without further comment.

195.    On or about December 21, 2009, after having argued and convinced the Court in June 2009 to keep their water claims and bifurcate them into a separate trial, Parsons filed its own motion to dismiss the water claims.

---

[4] Rule 2.4. Minute Entries, Orders and Judgments; Notice:

a. Minute Entries Containing Orders or Judgment:

(1) A copy of every minute entry containing an order, judgment or direction of the court shall be filed by the clerk in the individual case file and a copy mailed to each counsel of record or party not represented by counsel.

…

b. Preparation: Notice of Judgment and Copies:

(1) The clerk shall, no later than two (2) court days from the making of a minute entry, mail a copy of such entry to each counsel of record or party not represented by counsel.

(2) Immediately after the entry of a formal judgment, the clerk shall mail a notice of the entry, stating the date of entry, to every party who is not in default for failure to appear, by mailing to each counsel of record or party not represented by counsel, and the clerk shall further attach a copy of such judgment to the notice of entry of judgment. …

17C A.R.S. Super. Ct. Local Rules, Pinal County, Rule 2.4.

196.    On January 4, 2010 Judge O'Neil held a Rule 16 pre-trial conference in the 30 Acres case. Kesselring's attempts prior to the hearing to reach an agreement on a trial date were unsuccessful. Judge O'Neil initially stated, over Keating's, Cohen's, and Loucks' demand for an early trial date, that a trial date in the summer was impossible because of the civil Court's 6000-case calendar, and mid-2011 was the likely date range unless many cases settled and no other case(s) took priority—which he was not anticipating.

197.    After Judge O'Neil dismissed the conference and as Kesselring was exiting the courtroom and was out of earshot, Loucks had an *ex parte* communication with the judge. Loucks asked the judge if he knew anything about Kesselring's Special Action, and if he was going to be represented by the Attorney General's office. The judge had been out of the country so he did not know anything about it and asked Loucks if it was related to this case. Loucks told the judge that it was, when, in fact, it was a separate Appellate case. Because it was *ex parte* communication, Kesselring could not object or respond to the issue.

198.    On January 4, 2010, counsel for Parsons and Walkers acquired a copy of the judgment. Neither attorney notified Plaintiffs that the judgment had been issued. However, Keating, immediately began preparing documents to start the foreclosure process.

199.    On or about January 7, 2010, the Walker Defendants' Initial Disclosure Statement in the 30 Acres case was sent to Kesselring and Conservancy. In the disclosure, Keating stated that the Court had entered judgment in the 1,100 Acres case in December 2009 and the Walkers had already submitted it to the sheriff to initiate a foreclosure sale on the 1,100 Acres. This disclosure in a separate case was the first indication to Conservancy and counsel that a judgment had been entered.

200.   On January 8, 2010, the Court clerk sent a copy of the 54(b) judgment to Rensch.

201.   On or about January 8, 2010 Judge O'Neil issued a Minute Order that reflected his *ex parte* communication with Loucks as if it had taken place in open court; this was how Kesselring learned of the communication. She was not given an opportunity to object to it despite the fact that it was prejudicial and harmed her reputation and negatively influenced the Court. The Minute Order put Loucks' remarks about the Special Action issue on the record. And in contradiction to what Judge O'Neil had said four days earlier about scheduling but in accord with Parsons/Walkers' request, the 30 Acres simple quiet title case had moved to the top of the priority list of civil cases, with a trial date scheduled in September.

202.   On or about January 9, 2010, Rensch became aware that Judge Olson had signed the Partial 54(b) Ruling on December 7, 2009, but Rensch had not been notified or sent a copy. The Court issued a Notice of Judgment that was dated January 5, 2010 but filed on January 7, with notation "mailed/distributed" that day as well. The language in the 54(b) judgment stated that DPC/Ranch "may not fence the cattle or anyone else out of the Easement", effectively rendering the properties open to the public, devaluing the land, and making it unusable by anyone for any other purpose; this was done without a hearing on condemnation and in direct violation of DPC/Ranch's civil rights. In preparation for noticing the appeal, Rensch had been anticipating the signed order for over a month. By the time Rensch received a copy, the time to notice DPC/Ranch's appeal had already expired. Rensch then had to request that the Court reset the Notice of Appeal date to January 8, 2010, the postmarked date on the Court's envelope.

203.    On or about January 11, 2010, Rensch filed a Motion for Clarification requesting an immediate ruling in order to restore Conservancy's right to appeal, which had expired based on the signing date of the 54(b) judgment. During the status review held the same day, Judge Olson admitted that he failed to have a minute order issued, blaming this on either the clerk or his judicial assistant. He agreed to have the effective date of the judgment for the purposes of appeal be January 8, 2010. Rensch queried Keating and Loucks regarding the date they had received the judgment and brought to the Court's attention that they both received copies on January 4, *five days before* Conservancy.

204.    Because of Judge Olson's failure to serve the judgment to Conservancy, and Defendants' failure to acknowledge this with the Court, the Appellate Court found the appeal was untimely but ruled on the motions since none of the other parties objected.

205.    Keating's billing entries for January 4 through January 7, 2010 indicate that he received the judgment on January 4, began preparing the necessary forms and notices to send to the Sheriff on January 5, then finalized and sent everything to the Sheriff on January 7. On January 8, he called the Sheriff's office "to push the paperwork along." Keating had already submitted to the Sheriff the judgment and other paperwork necessary to initiate a Sheriff's sale, all *before* Conservancy even had notice that the judgment had been signed. Although Judge Olson did set the time to appeal the judgment as of the Court's postmarked date to Conservancy, on January 8, 2010, the Appellate Court relied on the date the judgment was signed (December 7, 2009), which negatively affecting their rulings.

206.    On or about January 11, 2010, in a joint response by the Enterprise to Kesselring's special action, Cohen, Loucks, and Keating accused Kesselring of bringing the 1,100 Acres

case into her Special Action, when it was the attorneys who attached the 54(b) judgment to their response. The attorneys acknowledged they knew Kesselring was never a party in the 1,100 Acres case. The even more egregious act was the attempt to influence the Appellate Court to view Kesselring the same as Conservancy. Doing so compounded the previous damages caused by the attorneys' false representations, which caused the subsequent sanctioning of Conservancy by Division Two, and linked Kesselring to Conservancy's case in the minds of the Court.

207.    Also on January 11, 2010, Keating benefitted the Enterprise by representing that Conservancy had abandoned the properties (as he had also falsely represented on August 5, 2009), suggesting a motion of abandonment so Walkers could take immediate possession. Keating's statement that Conservancy had left the property open to vandalism and other damage omitted the fact that the Court had ordered the easement be left open for cattle and anyone else. As long as Plaintiffs had access to the properties, they continued to monitor and maintain them, including repairing the Enterprise's staged vandalism.

208.    Additionally on January 11, 2010, the Court set a trial date for the issues remaining in the case, which were not addressed by the 54(b) Judgment filed on December 7, 2009.

209.    On or about January 26, 2010, Cohen and Loucks mailed to Rensch a fraudulently dated photo attached to Parsons' Reply to their Motion to Dismiss the Water Claim. This photo was identified as representing the condition of the Parsons' stockpond as completely filled with water on January 13, 2010. The purpose of the photo was to assert Parsons' urgent need to get its cattle onto the 1,100 Acres for watering at the stockpond. Plaintiffs introduced photos into evidence, showing the current day's newspaper so the date could not

be refuted, that demonstrated the photo provided by the Parsons had not been taken on or near January 13, 2010. On that date, the stockpond was nearly dry, thereby exposing the photo as a fraudulent representation. DPC/Ranch moved the Court to sanction this blatant violation. Cohen repeatedly represented to the Court, both in motions and verbally, that the purpose of the Parsons' easement was for cattle to reach the "certified" stockpond.

210.   In the Parsons-Fidelity case, on January 27, 2010, Judge Borek signed the Confidentiality Order for the Walkers-Parsons settlement to be disclosed. In the order, Cohen/MC&R required that upon termination of the case, Fidelity was required to either return or destroy the Settlement Agreement and certify, under oath, its destruction.

211.   On or about January 29, 2010, there was a hearing on Parsons' Motion to Dismiss its Water Claims as well as Conservancy's extensive motions for reconsideration of the summary judgment rulings and its leave to amend its complaint. Rensch repeatedly argued that Conservancy's evidence was about fraud and not about water rights. In Parsons' Response to Conservancy's Motion for Leave, rather than address this issue, Cohen stated that DPC/Ranch's amendment to bring in the stockpond fraud claim was "futile and prejudicial". Both Cohen and Keating made misrepresentations to the Court that there was no fraud on the part of their clients, even misrepresenting that water was never an issue between Walkers and Conservancy. All that was offered throughout this hearing was the unsupported, unexplained, and untrue inadmissible assertions by Cohen and Keating that their clients did not commit fraud.

212.   On or about February 1, 2010, after Cohen and Loucks opposed DPC/Ranch's motion to dismiss, manipulated the trial by getting the water issues bifurcated, and

misrepresented the issue at hand to be about water rights rather than fraud, Judge Olson

reversed his prior decision of March 9, 2009 and dismissed Parsons' water claims entirely,

enabling the Enterprise to again avoid litigation of their fraud on the Court.

213.    The February 1, 2010 Order stated that allowing DPC/Ranch's Motion for Leave to

Amend and the introduction of claims would "clearly, demonstrably and unduly prejudice"

Parsons and Walkers. Judge Olson also stated that since "Parsons and Walkers have

expressly denied the allegations", no sanctions would be addressed. This failure to allow

Plaintiffs to amend prevented them from asserting crucial elements of fraud surrounding the

certification of the stockpond. The Court denied all DPC/Ranch's motions, and a month

later denied its Rule 59 Motion for a new trial regarding Parsons' easement.

214.    On February 8, 2010, Conservancy filed a notice of appeal of the 54(b) Judgment.

215.    On or about February 15, 2010, Alternative Energy Approaches LLC ("AEA"),

owned at the time by Kesselring and Charron, were in a separate and unrelated lawsuit with

a web designer (Lai) who failed to produce AEA's website. In responses to NUIs, AEA

received a statement that Yendes (acting as an Enterprise agent) had contacted Lai and his

attorney and had made false derogatory assertions about AEA.

216.    On or about February 19, 2010 Conservancy discovered the obscure reference to the

Parsons-Fidelity lawsuit and then discovered that the Pima County Court docket showed a

Confidentiality Order filed on January 28, and the Minute Entry on February 1 indicating

that the parties would be finalizing a settlement agreement. Rensch called Kam, who

refused to speak with him. Rensch then ordered some documents from that case; the 1,100

Acres case had been referenced many times *prior* to Parsons' June 2008 obscure mention of

1    it to DPC/Ranch.

2    217.    On March 4, 2010, Keating made a billing entry that indicated his participation with

3    Yendes and the Enterprise in perpetrating interstate interference in AEA's business lawsuit.

4    The bills were disclosed in Keating's application for attorney's fees and costs on behalf of

5    the Walkers in May 2010 and discovered by Plaintiffs in 2011during the preparation of this

6    Complaint.

7

8    218.    On or about March 8, 2010, Plaintiff Kesselring voluntarily prepared the paperwork

9    to withdraw from AWD Farms LLC because she was concerned about further harm by the

10   Enterprise and the safety of her business associates in that LLC. That same day Judge Olson

11   denied DPC/Ranch's Motion for New Trial re Parsons' Summary Judgment and denied the

12   Request for Findings of Fact and Conclusions of Law Re: Conservancy's Rule 59 Motion.

13   The Court adopted and affirmed its prior findings and conclusions, and noted that the

14   request was outside the scope of Ariz.R.Civ.P., Rule 52(a).

15

16   219.    On March 10, 2010, Parsons filed eight Motions *in Limine* regarding the April trial.

17   These motions intended to eliminate every relevant issue that DPC/Ranch would have

18   reason to present at a trial including the stockpond, fraud, Gookin, the easement,

19   foreclosure, adequacy of the notice of the easement from Walkers to DPC/Ranch, and undue

20   influence. DPC/Ranch filed their responses on March 22, 2010.

21

22   220.    On or about March 15, 2010, after Kesselring learned that the Enterprise, through

23   Yendes, was interfering with AEA's lawsuit and targeting the company and Charron, she

24   voluntarily prepared the paperwork to withdraw as a member of AEA because of the harm

25   the Enterprise was causing to AEA, and, further, because she feared for Charron's safety.

26

27

221.    In his March 16, 2010, Motion to Continue Trial, Rensch lodged an objection to expansion of any of the issues beyond "whether or not DPC/Ranch interfered with Parsons' use of the easement and, if so, the damages therefore." Neither Cohen, Loucks, nor Keating objected nor did they take any steps to specify other issues for trial. The attorneys did not comply with Rule 16(d), which requires the joint memoranda to be filed five days before trial. In fact, no joint pretrial statement involving all the parties in agreement and indicating what issues would be tried was ever filed.

222.    The Court published a Minute Order on March 22, 2010 setting a status review hearing for March 26, 2010, in which the Court stated:

> The Court seeks an update from counsel on their efforts to narrow the remaining claims in this matter, and the Court shall hear the views of counsel on vacating the current trial date and staying this matter, but not staying the enforcement of judgments. It appears to the Court that, in light of the appeal and cross-appeal, as well as the unexpired right of redemption, the more economical and appropriate course might be to await resolution of these issues before proceeding.

The order did not set forth any triable issues. Despite Rensch's best efforts and a month before trial, Rensch did not know what issues were to be tried so he filed a Motion to Continue, asking the Court to clarify and to rule on what issues remained for the trial.

223.    Rensch filed motions attempting to place on the record notice of all issues for Conservancy's appeal; after they were all denied and the Court ignored evidence of fraud and requests for sanctions, Rensch filed to strike Judge Olson for cause on March 26, 2010.

224.    On or about March 31, 2010, ASLD agent Webster again contacted Kesselring at the Enterprise's behest, alleging that she had trespassed by repairing a road. Webster was informed by Rensch that his clients (Conservancy) and not Kesselring were responsible for

58

the repair, but he ignored the attorney's assertion of responsibility and threatened Kesselring

with violations. Webster's continued threats and harassment towards Kesselring indicate his

representation of the Enterprise, rather than the state.

225.    On April 6, 2010, several gunshots were fired at Plaintiffs' independent contractor

("Contractor 1") while working on Kesselring's 30 Acres. Two bullets flew within inches of

his head and another blew out the entire rear window of the tractor. He called 911, then

Charron and Kesselring, and eventually escaped Kesselring's property. On his way out, he

was met by two PCSO deputies who compelled him to return with them to Kesselring's 30

Acres. Contractor 1 witnessed the deputies finding and retrieving what was left of the bullet

lying within the cab of the tractor. When the deputies spoke by phone with Kesselring and

Charron to inquire as to who may have a motive to shoot at Contractor 1, they were told

about the long history of the dispute with the Parsons. Contractor 1 then witnessed the

deputies mocking the situation, speaking in a sarcastic manner, and showing no concern for

his safety. The incident report falsely stated that the deputies were unable to find any

evidence. This bullet fragment was never submitted to the evidence department for the Pinal

County Sheriff. The responding deputies termed the shooting accidental, did not investigate

further, and within a day closed the investigation for "lack of leads."

226.    On the next morning, April 7, 2010, another shooting occurred. Contractor 1 had

returned to the 30 Acres and was sitting inside his trailer when a single bullet was fired

through the transparent sliding glass door, missing him by less than two inches. He called

911 and fled the property in his truck. He was intercepted by a deputy who had responded

the day before and two other deputies who compelled him again to return. The deputies

identified the bullet's trajectory but did not attempt to retrieve it, and then forced Contractor 1 to leave the property.

227.    The incident report included that Puroll contacted the reporting deputy after the shooting and also told the deputy that he was going to contact Clay Parsons and that Plaintiffs and Parsons were in a long legal battle over the property. This untrue statement parroted Keating's and Cohen's insistence that Kesselring was part of the 1,100 Acres case.

228.    Later on April 7, 2010, within hours after Contractor 1 was forced to leave the property, in a complex and coordinated effort the Enterprise suddenly blocked Plaintiffs' access to their properties with a large, elaborate, custom-made steel gate secured by a heavy chain and three large locks. Also, two other wood and barbed-wire gates across the only remaining route to the 30 Acres were chained and locked. For many decades, the roads involved had been public and freely used by hunters, recreational users, and various governmental agencies. Plaintiffs are informed and believe these roads are located on property controlled by Herb and/or John Kai Jr., through their LLC. Plaintiffs are informed and believe that Herb Kai and his brother John Kai Jr. are other land developers involved with the Parsons in selling property to the potentially huge development projects in the Picacho area.

229.    On or about April 8, 2010, a hearing was held regarding Conservancy's motion to strike for cause. Rensch addressed the failure of Judge Olson to apply a fair and equal standard to all parties. Cohen made fraudulent misrepresentations, some of which were similar to those used in the trial Court and others in contradiction to those used in the Appellate Court to discredit Conservancy and to also avoid the real issue of the motion.

1    Keating denigrated Plaintiffs before yet another Court to contaminate and distract the Court.

2    The motion was denied.

3    230.    After this hearing Rensch was threatened by Joseph Parsons, one of the controlling

4    members of the Enterprise. Parsons followed Rensch out of the courthouse and informed

5    Rensch that he knew where Rensch and his family lived and where his children went to

6    school, and provided other personal information about his family. Parsons was attempting to

7

8    intimidate Rensch into withdrawing from his representation of Plaintiffs.

9    231.    Later the same day, Loucks filed a unilateral Pre-trial Memorandum, just two

10   business days before the scheduled trial, and untimely based on Rule 16(d)(1) Ariz.R.Civ.P.

11   In this memorandum Parsons asked the Court for attorneys' fees against Pierron and Lipin

12

13   personally, even though neither individual had ever been a named party in the lawsuit

14   against Parsons, nor had Parsons ever amended their complaint or served Pierron or Lipin to

15   bring them in as parties.

16

17   232.    On April 8, 2010, Parsons' filed a Pre-Trial Memorandum stating that the only issues

18   for the April trial were "the remaining issues as to the width of the easement and any

19   damages that may have resulted from Parsons being denied access to its easement..."

20   Despite the fact that there had been no compliance with Rule 16(d) by Cohen and Keating,

21

22   despite there was a pending appeal on substantive issues, and even though Rensch had

23   diligently attempted to secure Parsons' and Walkers' cooperation with Rule 16(d), on April

24   8, 2010. Judge Olson, over Rensch's continued objections, set a status conference for the

25   next morning, During the conference, once again over Rensch's objections, Judge Olson

26   ordered a bench trial for the next business day, Monday, April 12, 2010. The litigation had

27

been all along geared towards a jury trial.

233.    On April 9, 2010 Contractor 1, Charron, and a security guard braved the danger to Kesselring's property and discovered that the trailer in which Contractor 1 was living plus other dwellings on the property had been ransacked and burglarized. Most of Contractor 1's personal belongings had been stolen or destroyed and many of Plaintiffs' were, as well. The couch, where the bullet entered, had been slashed open at the point of contact, presumably in search of the bullet. Plaintiffs believe that Puroll had informed the Enterprise that the responding deputies had failed to retrieve the bullet.

234.    On the same day, the Court held two impromptu status conferences regarding whether to proceed with the trial scheduled for April 12. Rensch objected to the trial proceeding, because the Rules of Civil Procedure were being violated by the absence of a pre-trial memorandum that all the parties agreed on. The Court ordered that it would conduct a bench trial commencing the morning of the 12th (the next business day), thereby violating additional Rules of Civil Procedure. Rensch then stated that because of the Court's unlawful holding, Conservancy would not appear.

235.    On April 12, the morning of the trial, Contractor 1 and a new contractor hired to provide security ("Contractor 2") arrived on Kesselring's 30 Acres and discovered vast devastation by fire to the dwellings, equipment, tools, and supplies. Plaintiffs believe it was the Enterprise who destroyed everything that made the property habitable and functional for conducting business. Plaintiffs also believe that the fires ensured the destruction of the bullet, valuable evidence in identifying the perpetrators. The remains were still smoldering as the men surveyed the devastation. As if to make it clear that the acts were intentional, a

rented portable toilet had been moved into the housing area fire.

236.     Just minutes after Contractors 1 and 2 had arrived on the 20 Acres they were shot at with many rounds from high-powered rifles. The shots were coming from an estimated 4–6 snipers positioned in the South and West hills overlooking Kesselring's property. These lease lands are controlled by members of the Enterprise. When the contractors called 911 they were told that the PCSO deputies would not be entering the property to protect them and that they had to make it out on their own. The Pinal County Sheriff's officials waited for them about eight miles from the property.

237.     Contractors 1 and 2 did escape Kesselring's property, and they met six Pinal County Sheriff's officers including two of the deputies who had responded to the April 6 and 7 shooting incidents. One of the officers was wearing plain clothes and refused to identify himself. Plaintiffs are informed and believe that based on the detailed physical description by Contractors 1 and 2 that this officer was Louie Puroll. The two deputies who were responding for the third time asked Contractor 1 why he had not quit yet, adding that Contractor 1 was eventually going to end up dead if he stuck around. The officer believed to be Puroll ("Puroll*")[5] and the officers proceeded to interrogate Contractors 1 and 2 for a long time. Puroll* treated the shootings as a big joke and told Contractor 1 that he was being played by his employers who were setting him up to get killed to make the Parsons look

---

[5] To the date of this filing, despite repeated intense attempts and the reporting of the license plate numbers, Plaintiffs have been unable to verify Deputy Doe's identity or to verify that Puroll* is indeed Puroll.

bad. Puroll* also falsely accused Plaintiffs of perpetrating the crimes that the Enterprise was committing against them.

238.    Contractor 2 was permitted to leave, but Puroll* forced the terrified Contractor 1 to return to Kesselring's property, unarmed and driving the lead vehicle with Puroll* and another unidentified deputy ("Deputy Doe") following him. Contractor 1, now the victim of three incidents of sniper fire on the 30 Acres, called Plaintiffs and witness Charron, reporting that he felt threatened and feared for his life, and expressed concern that he might not get out of there alive. He further reported that Puroll* and Deputy Doe did not appear to be working as law officers, but instead seemed to be working for someone else who had sinister motives. Contractor 1 later surreptitiously called Plaintiffs from the 30 Acres and gave the license plate numbers of the two Sheriff's vehicles, to assist in the identification of the officers in case they or others were to murder him.

239.    Upon arriving at the South entrance to the 1,100 Acres, Puroll* told Contractor 1 that he (Puroll*) had been on Plaintiffs' properties with Parsons just two days earlier, spending personal time with Parsons and looking at his cattle. Puroll* and Deputy Doe told Contractor 1 "the people you work for [Plaintiffs] had made one payment on the land and then started suing everyone around them." Further, Puroll* stated to Contractor 1 that Plaintiffs had stolen from Home Depot the cement that was on the property, with the inference that Contractor 1's care and use of the cement made him complicit in a criminal theft. Puroll* then suddenly volunteered to Contractor 1 that "Parsons and them had nothing to do with it" and stated to him that it was Plaintiffs who were trying to kill him. Puroll* threatened Contractor 1 that if Plaintiffs or anyone working for them called the Sheriff

64

again, an arrest warrant would be issued for false reporting.

240.    Puroll* and Deputy Doe took photographs of the equipment and supplies that had not been destroyed in the fires. The incident report did not mention or contain any of the photographs taken by Puroll*, nor does it report that Puroll* and Deputy Doe were even at the scene of the crimes or saw the fire damage. It also fails to mention that they forced Contractor 1 to return to the 30 Acres. Also missing from the report was the extent of incendiary damage and the highly suspicious nature of the fires. This report was the third incident report of sniper fire, which constituted aggravated assault with a deadly weapon. All three incidents were closed without any attempt to recover evidence. No attempt was made to recover ejected shells from rifles that were fired from the surrounding hills. Plaintiffs believe that Puroll* willfully agreed to aid and abet the commission of these unlawful acts of arson and aggravated assault.

241.    Three separate investigators later each determined that arsonists had set three separate fires to property on Kesselring's 30 Acres, in the evening or very early morning of April 11/12. A fourth and separate act of arson was later discovered about 100 yards away from the three fires. A number of valuable and irreplaceable mature ironwood trees were ravaged by arson in this fourth initially unnoticed act. The four acts of arson destroyed three dwellings and many tens of thousands of dollars worth of essential equipment, supplies, and tools that had been designated for use in Kesselring's agricultural operations. The 30 Acres were thus rendered uninhabitable, the land devalued, and Plaintiffs' business operations were neatly (for the Enterprise) and completely shut down.

242.    The acts of arson were affirmed by the insurance company, whose investigator had

determined that the perpetrators must have had knowledge of what was and was not insured. The claims adjuster noted that what had been burned were almost exclusively items for which Plaintiffs had no insurance.

243.    Meanwhile, having convinced the Court to hold a bench trial on April 12 in the 1,100 Acres case without Conservancy's participation and while Plaintiffs were dealing with a series of increasingly horrific events within the span of a week, Cohen, Loucks, and Keating gave an entirely one-sided presentation of any issues Parsons and Walkers wanted to bring up. In fact, Cohen and Loucks introduced new issues that had not been raised or even mentioned in Parsons' unilateral and last-minute pretrial statement. Also, in further violation of the Rules of Civil Procedure and with frightening consequences, Pierron and Lipin were named as personally liable for damages even though Parsons had not legally amending their complaint. (Keating filed his unilateral pretrial statement the day of the trial *but after it had concluded*). Not surprisingly, the Court ruled entirely in favor of Parsons and Walkers, significantly benefitting the Enterprise and crippling Conservancy's ability to continue to fight it. The Court ordered that Parsons' and Walkers' counsel submit proposed forms of judgment by May 4, 2010 and set the matter for final review on May 21, 2010.

244.    On April 13, 2010, the Court issued a verdict in favor of the Parsons and Walkers. The verdict included an award for damages on Parsons' pasture agreement from January 2009, and stated that the roads and trails on the properties were to be used by Parsons for the driving of cattle—a phrase never before presented in any judgment or easement description, and that the width should be 150 feet and, as stated in the 54(b) judgment, left open for public access *by anyone* (emphasis added). The purpose of this trial verdict, awarded at the

direction of the Walkers and Parsons and with no due process, in essence condemned the 1,100 Acres by essentially turning it into public property and so greatly devaluing the land that no one other than Walkers would submit a bid at the sheriff's sale. The Court awarded Parsons damages, attorneys' fees, and costs, and a 150-foot easement to drive cattle along roads and trails (as designated by Parsons). Note that the original easement designated "ingress and egress *across* (emphasis added) all roads and trails." And notwithstanding the vastly increased value Conservancy had added through their fixed land improvements, Walker was awarded a deficiency judgment, fraud damages, and attorneys fees' and costs.

245.    On April 14, 2010, Keating filed on behalf of Walkers and Parsons a joint response to Kesselring's Petition for Review. From the Joint Scheduling Memorandum process in December 2009, on, Keating, Loucks, and Cohen functioned as one voice in the 30 Acres case, and in email exchanges gave each the authority to sign for one another.

246.    On or about April 15, 2010, Webster of ASLD followed up in a letter to Kesselring, threatening her with fines and potential legal action and requiring her to schedule a conference to legitimize her temporarily driving over a state road that has historically been used freely by hunters and sportsmen. Webster's series of actions virtually prove that his motive was to assist the Enterprise in blocking Kesselring from accessing her property.

247.    During the time of the coordinated violent acts committed upon Plaintiffs, Rensch's family became aware that unidentified persons were watching their home and following them. The initial intimidation and threats by the Enterprise against Rensch had been compounded by the escalated acts of violence against Plaintiffs, and now his family was being targeted. On or about April 21, 2010 Rensch informed Plaintiffs that he was resigning

as attorney of record because of his reasonable fear that he and his family were in imminent danger. Rensch thereupon immediately submitted his motion for withdrawal and completely ceased his representation of Plaintiffs. The order granting this motion was not signed for a month. This delay dealt another devastating blow to Plaintiffs because not only had they lost Rensch, they were devoid of representation.

248.    In the very early morning of April 21, 2010, Contractor 1 escorted a fire/private investigator hired by Plaintiffs to Kesselring's 30 Acres. Upon approach, Contractor 1 cautiously checked out the area using binoculars and saw in the distance unknown persons crouched on the ground on the south ridge overlooking the 30 Acres; these persons, on Parsons-controlled land, appeared to be armed. Contractor 1 and the investigator heeded Puroll's* warning to not call 911 again. Contractor 1 attempted to capture them on video, but they hastily departed. When Contractor 1 returned, he and the investigator cautiously proceeded onto the 30 Acres. The investigator determined that the fires were intentionally set with three points of origin, and a fourth was discovered later.

249.    On April 29, 2010 the Sheriff's Foreclosure Sale resulted in a credit bid of $1,100,000 by the Walkers. The Enterprise successfully accomplished its scheme to wrest control and ownership the 1,100 Acres from Conservancy.

250.    On May 4, 2010, Keating emailed Rensch a copy of his Notice of Lodging of Walkers' Proposed Form of Judgment but did not serve the proposed form of order, in violation of Ariz.R.Civ.P., Rule 5(j)(1)(E).

251.    On May 9, 2010, Robert W. Walker died.

252.    On May 14, 2010, in violation of the Court's order requiring proposed judgments be

lodged before May, 4, 2010, Walkers' counsel served a copy of two proposed judgments to Conservancy's counsel. On May 17, 2010 Walkers' revised proposed form of judgment was filed by the clerk of the Court.

253.    On or before May 18, 2010, the Enterprise staged an act of vandalism by carefully removing a panel from the large shop/warehouse on Conservancy's 1,100 Acres, which exposed the interior of the building. The vandalism was reported to PCSO for insurance reasons, but PCSO did not investigate. In January 2010 Keating stated to the Court "Now in 2010, they have abandoned the Properties in the literal sense leaving the Properties open to vandalism and other damage…."

254.    On May 21, 2010, with over a week remaining in the statutory period for assessing fair market value, the Court signed the Judgment in favor of the Walkers. This deprived the Plaintiffs of the opportunity to petition the Court to establish the fair market value of the property prior to the Court fixing the dollar value of the deficiency. In violation of A.R.S. § 12-1566 and A.R.S § 33-814, no priority hearing had been held to determine fair market value of the foreclosed property, legally rendering the sheriff's sale void. Further, the Court record shows that the Walkers lodged a revised form of Judgment on May 17, 2010, which the Court signed on May 21, 2010 without allowing Conservancy the opportunity to file their objections, in violation of Rules 58(d) and 6(a) Arizona Rules of Civil Procedure.

255.    Even without an appraisal, the Walkers had ample notice of the increased property value. They had conducted onsite inspections, had admitted by email that they were fully aware of the vast development and improvements made to the property by Conservancy, and were notified by DPC and Ranch of the fixed land assets in the 2009 bankruptcy filing.

Walkers' bid for the property considered nothing more than the raw land plus the interest

assessed. No value consideration was offered for the improvements, the increased worth

from the water discovered, the upcoming paving of Pecan Road, or from the County's long-

range development plan.

256.    Conservancy never received, either directly or indirectly, a copy of the Walkers'

judgment. Counsel for Walkers did not send it nor did the Court, which has no record of

certificate of service for having done so. The Judgment does not contain a mailing

certificate. DPC, Ranch, Pierron, and Lipin were not present nor were they represented by

counsel when the judgments were signed on May 21, 2010.

257.    Additionally, the Court's May 21, 2010 signing of Parsons' judgments in the amount

of $463,876 is also disputed because of the following critical defects:

    a.    The Judgment ruled on issues that had not been disclosed as contested.

    b.    The Parsons' Judgment improperly assesses damages against Lipin and
    Pierron.

    c.    Conservancy was also never legally served with the judgments.

    d.    Pierron and Lipin were made responsible for damages in a case in which they
    were not named parties.

258.    On or about May 24, 2010, the vehicle belonging to the managing member of AWD

Farms was discovered to have been criminally damaged overnight. A tall vehicle such as a

truck appeared to be the instrument used in the significant damage. This marked what

Plaintiffs believe to be an attack on Conservancy's investors, who were now funding

Kesselring's new agriculture endeavors on her 30 Acres.

259.    On June 1, 2010, Cohen and Loucks had the unlawful judgments procured for

70

Parsons on May 21, 2010 emailed to Rensch, who was no longer attorney of record for DPC/Ranch. Parsons' judgment was not mailed to Pierron, Lipin, DPC, or Ranch by MC&R and there is no record of certificate of service.

260.    On or about June 4, 2010, Kesselring discovered that the Farms' work truck had been vandalized and broken into while parked in Tempe. Plaintiffs allege that this and other intentional acts of destruction by the Enterprise to further intimidate Plaintiffs at their permanent and temporary residences and continue the pattern of business interference by targeting vehicles Kesselring needed for her operations on the 30 Acres.

261.    On June 22, 2010, Geoffrey Brimhall was sent a Letter of Reprimand by the Arizona Board of Registrars because he conducted surveys that were not in accordance with the Arizona Boundary Survey Minimum Standards. These are the very standards that Brimhall, under oath, admitted to violating in DPC/Ranch's case.

262.    On or about July 4, 2010, Kesselring discovered an attempt at a second vandalism in two months of the same work truck parked in front of a residence. Evidence of the vandals was found on surveillance video showing a truck slowing down, looking apparently for Kesselring's truck, then backing up to attempt to steal the diesel fuel.

263.    On or about July 6, 2010, AWD Farms' insurance company issued a non-renewal notice for frequency of losses. However, the claims manager handling the arson fires stated that the exposure had changed because the insured were under attack by someone who was committing arsons, thefts, etc., and that the insurance company did not have a named mechanism for canceling the policy because there was a known party that was trying to destroy an insured's property.

264.     On or about August 9, 2010, AEA noticed its intent to depose Yendes to investigate his and Walkers'/Parsons' potential destructive interference and conspiracy to harm AEA and its members. Within 24 hours of receiving notice, Lai's attorney stated that he intended to withdraw as counsel and that Lai intended to voluntarily dismiss his counter-claims. On September 2, 2010 a Minute Entry ordered that Defendants' Answer was withdrawn; Defendant's Counterclaim was dismissed, with prejudice; Defendant's attorney of record was withdrawn; and Plaintiff AEA may proceed by default. Plaintiffs believe that Lai and his attorney had something so serious to hide about their interactions with Yendes that they voluntarily withdrew from the case and, further, that the Enterprise may have made it worth their while to do so.

265.     On September 3, 2010, Conservancy filed the main brief of its appeal.

266.     On or about September 26, 2010, a legal assistant for Conservancy contacted the Pinal County Clerk regarding issues for its appeal. This is when Conservancy first became aware that they may be missing documents from the 1,100 Acres case. The clerk emailed a deficiency judgment that was filed by Walkers on May 21, 2010, which had not been served on DPC, Ranch, Pierron, or Lipin. Two judgments for Parsons and a Minute Entry were emailed to DPC/Ranch's former attorney, but not to any of the Defendants. In a similar pattern of violations of the Rules of Civil Procedure that harmed Conservancy, the 54(b) judgment had not been served; the failure of the Court, in conjunction with attorneys Loucks and Cohen, to properly serve documents upon Plaintiffs has destroyed their appellate rights.

267.     On or about October 29, 2010, the Pinal County Sheriff issued a Sheriff's Deed to

the Walkers, and the Enterprise then fenced off the gates to the 1,100 Acres, preventing Kesselring's access to her easement to her 30 Acres.

268.    On November 13, 2010, a specially modified trailer worth $5,000 was stolen from AEA's office/warehouse in Tempe. Kesselring had borrowed the trailer for specialized business purposes on the 30 Acres the month before, and at that time the Enterprise was seen photographing it. AEA security camera footage revealed four separate attempts and almost two hours of time to release the heavily secured trailer in order for someone, believed to be the agents of the Enterprise, to drive off with it. The Tempe Police stated that because of the difficulty in releasing the trailer, its theft was almost certainly an act of premeditation, and that someone wanted this particular trailer very badly.

269.    On or about November 17, 2010, prior to Conservancy filing a Rule 60(c) motion Gookin provided Conservancy with a water development report. This water report computed that the estimated water supply available under the 1,100 Acres was approximately 16.3 billion pumpable gallons and would, therefore, support the residential development of 500 lots of 2+ acre home sites.

270.    On November 18, 2010, Cohen/Loucks filed Parsons' Answering Brief in the 1,100 Acres case appeal. Their brief contained a new fabricated reason for stipulating to the dismissal of AWD Farms from the case: that AWD Farms had failed to "timely prepare for trial." AWD Farms was well prepared to prove Parsons' stockpond fraud and theft of water and water rights. This and multiple other misrepresentations on the subject illustrate how the attorneys continually invented new reasons to best obfuscate the real issue that the Enterprise was determined to hide. Also, in the Answering Brief Cohen and Loucks

declared additional falsehoods. They suddenly claimed that Conservancy's stockpond, the real certified one, was actually Parsons' stockpond to which they had been referring all along; they now described Parsons' stockpond as a portion of the certified stockpond that lies "partially" on Parsons' "Stockpond Parcel". By furthering these misrepresentations before the Appellate Court, the Enterprise continued its pattern of concealment and prevention of AWD Farms' and DPC/Ranch's evidence of the fraudulent stockpond certification from being presented to the Court, further denying their right to ever be heard.

271.    On November 22, 2010, DPC, Ranch, Pierron, and Lipin filed their Motion for Relief from Judgment Pursuant to Rule 60(c) because of 1) multiple defects in both Walkers' and Parsons' Judgments, 2) failure to follow the Rules of Civil Procedure, and 3) violations of their due process rights. Parsons, in their response to the motion, admitted that they added Pierron and Lipin as individuals in their Pretrial Memorandum, just two business days before the trial when at no time during the 5½ year litigation had they amended their complaint or served Pierron or Lipin to bring them in as parties to the case. Additionally, the judgment presented to and signed by the Court assigned to these non-parties, as individuals, attorney fees plus damages dating back the entire 5½ years.

272.    On or about December 13, 2010, Keating misrepresented to the Court in Walkers' Answering Brief that Pierron and Lipin "were able to convince the trial Court that the settlement had not been fully approved at the time" by Pierron and therefore caused delay and expense. This fraudulent representation disparaged both Conservancy and the trial Court record wherein a settlement discussed after the Walkers' summary judgment in August 2009 was ruled invalid because Conservancy was not present in Court during

settlement negotiations nor even notified of them, and there was no express grant of authority for settlement. In even further contradiction, during the October 2009 hearing to determine whether this settlement was enforceable, the Court stated five different times on the record that it was assuming, with no reasons given, that the principal witnesses, Pierron, Lipin, and Charron were not credible. Keating continued his longtime pattern of making maligning remarks about Conservancy.

273.    Additional misrepresentations by Keating in Walkers' Answering Brief required Conservancy to devote 12 full paragraphs of their Reply to identify the blatant misstatements for the Appellate Court. Conservancy asked the Appellate Court to disregard these unsupported claims in their entirety because of Keating's failure to supply any and/or accurate cites from the record. Keating's false statements were exposed again when he represented in a motion that Lipin prepared a map showing the stockpond with the name "Parsons" written by Lipin next to the 20-acre parcel. Examination of the map shows no pond or tank drawn or referenced, supporting Conservancy's position that they did not have knowledge of the stockpond until after their purchase of the property.

274.    Continuing to argue outside the record, Keating made false and misleading statements, mischaracterizing Pierron's 2003 document search, in which she discovered the Walkers-Parsons contract, "another self-serving, unsupported allegation." Keating failed to mention that it was the Enterprise who completely hid the Walkers-Parsons contract regarding the 1,100 Acres and the stockpond fraud that instigated the 6-year-long lawsuit. Keating also claimed (without a record cite) that pages in Walkers' 2009 Statement of Facts show "documents prepared and signed... accepting everything about the cattle easement and

about the Parsons' stockpond...." The only document exhibited in the Walkers' statement of

facts signed by Lipin and Pierron was a copy of the Deed of Easement that has no language

whatsoever about cattle or a stockpond and supports Plaintiffs' position that they did not

have knowledge of either.

275.    Keating's Answering Brief contain no cites to the transcript where he stated

"evidence presented by Walkers in the form of independent testimony that support the fact

that Plaintiffs knew all about everything anyway," and there are no exhibits referred to in

the brief. Keating's complicity with the Enterprise is shown by his influencing the Courts

through character assassination and fraudulent representations in order to distract from the

underlying scheme to defraud Conservancy.

276.    On December 20, 2010, Keating disregarded the Court's order from over a year

before and emailed Judge Olson a copy of Walkers' Response in Opposition to

AWD/DPC's Motion for Relief, with a second email sent to the judge the same day

explaining that the first attachment contained errors. On December 3, 2009, over objections

by Rensch regarding the previous acts of *ex parte* communication between the attorneys for

the Enterprise and Judge Olson's chambers, Judge Olson had issued his own Minute Entry

Order on the subject, as follows.

> IT IS FURTHER ORDERED directing counsel shall cease the process of
> using emails as a form of communication with the Court.

277.    Keating stated in his response that Conservancy "have never come close to showing

this Court or any other Court how any of their expenditures *improved* the Property."

However, Keating's own email of August 26 classified the dams, ponds, fences, and

buildings as permanent *improvements*. Walkers' inspection company that fully examined the 1,100 Acres in August, 2010 reported, among other things, that the shop/warehouse was of incredible construction as evidenced by its ability to withstand for so many years the severe high winds on the property.

278.    On or about December 30, 2010, Keating mailed a letter to Conservancy's appellate counsel, Richard Strohm ("Strohm"), stating that Kesselring cannot use her easement and no one associated with Plaintiffs can even set foot on the 1,100 Acres or else be prosecuted for criminal trespass. According to the judgments against Conservancy, it is Plaintiffs' understanding that there still exists an easement open to the public for cattle or anyone else to use across the 1,100 Acres. Additionally, Kesselring's easement case is still pending and no court of law has ruled that Kesselring does not have a legal right to use her easement to cross the 1,100 Acres to get to her 30 Acres.

279.    Loucks and Cohen made a material misrepresentation of Parsons' stockpond in an objection filed with the Appellate Court on January 20, 2011, by referencing by another new description that had never been used in the trial Court litigation. The attorneys coined a new phrase that "a certified stockpond that Parsons purchased was only partly on the parcel Parsons owns." But a year earlier and throughout the litigation to that point, Loucks and Cohen stated in Parsons' Response in Opposition to Motion for New Trial filed February 8, 2010: "Parsons has never claimed ownership in a stockpond outside of its 20 acres."

280.    On February 24, 2011, the Court denied Conservancy's Motion for Relief from Judgment 60(c). On or about March 2, 2011 former counsel for Conservancy, Rensch, received via email a ruling from the Pinal County Court in the 1,100 Acres case. Familiar

with the lack of proper notification from this Court, Rensch forwarded the ruling to

Conservancy. Strohm had been waiting for the ruling in order to file a notice of appeal and

did not receive received any notification of this ruling until Conservancy forwarded him

Rensch's email. On March 24, 2011 Conservancy filed a Notice of Appeal of Judge Olson'

final decision against Conservancy.

281.    On or about March 4, 2011, Keating filed Walkers' Objection to Appellants' Motion

to Strike 1) all references to the judgments procured in violation of the Rules of Civil

Procedure and 2) the inclusion of the Sheriff's Deed obtained 11 months after the 54(b)

judgments on appeal. Strohm stated in the Reply file on March 14, 2011 "In other words,

Walkers simply want to argue the merits of a judgment rendered in their favor in order to

prejudice the Court and obfuscate the issues which are to be decided by this Court. This is

improper and completely irrelevant to Appellees' legal arguments on the 54(b) Judgments

that are subject of this appeal."

282.    On or about April 20, 2011, one week prior to oral argument, the Court of Appeals

issued its opinion against Conservancy in the 1,100 Acres case. On April 29, 2011, Division

Two issued its decision stating that the motion for a new trial challenging the December 7,

2009 partial judgment was untimely because it was not filed within 15 days of the entry of

the judgment. The Court of Appeals also noted that had Plaintiffs timely appealed from the

entry of final judgment they could have obtained review of the trial Court's partial

judgment, the denial of its motion for a new trial, and other interlocutory orders. However,

Plaintiffs never had the opportunity to file a timely appeal because they were not noticed of

the final judgments. The trial Court had not appropriately informed the record of the non-

service of the December 7, 2009 judgment and although the judgment contained 54(b)

language, it was not a final, appealable judgment concerning Parsons, and did not provide

the basis for appellate jurisdiction pursuant to A.R.S. § 12-2101(F)(1). Because the Court

lacked jurisdiction to address the issues raised in Plaintiffs' appeal against Parsons, it

dismissed Plaintiffs' appeal from the judgment in favor of Parsons and denied of the motion

for a new trial in its entirety, stating that the trial Court erroneously certified the partial

judgment as to Parsons as a final, appealable judgment pursuant to Rule 54(b)—thus

providing a basis for Plaintiffs' appeal.

283.    On or about April 30, 2011, criminal damage to the vehicle driven by Pierron

occurred overnight while the vehicle was parked in front of her residence. Significant

damage occurred in this next instance in the Enterprise's series of vehicle vandalism.

284.    On June 27, 2011, another judgment in favor of Walkers in the 1,100 Acres case

appeal awarded attorney fees and costs against Conservancy in the amount of $36,323, over

the objections raised by Conservancy regarding the excessive charges.

285.    On or about June 29, 2011, Strohm emailed Conservancy stating that the signed,

final order regarding Judge Olson's 60(c) ruling had actually been signed on June 14, 2011.

Strohm requested a copy of it from Loucks, whose copy was date stamped as received by

his firm on June 16, 2011, while Strohm's mailed copy arrived and was date stamped June

22, 2011. Thus the pattern continued, of duplicity and non-notice to Conservancy regarding

actions in the 1,100 Acres case affecting their appellate rights.

286.    On August 1, 2011, attorney Janet Spears, newly retained to represent DPC, Ranch,

Pierron, and Lipin, requested a response from Loucks regarding her request to reschedule

debtor depositions.

287.    On August 2, 2011, attorneys Loucks and Keating sent Ms. Spears combative letters and, in her words, "Counsel for Walkers [Keating] responded with a scathing letter attempting to insult and bully Defendants [Conservancy] and me, refusing to postpone the depositions." Having engaged in unsuccessful good faith efforts with Loucks to obtain postponement, Spears filed a Motion for Protective Order in Judge Olson's Court.

288.    Conservancy's appeal of the denial of its 60(c) motion was not briefed, in part because of the delay in obtaining a signed order from the trial Court. Conservancy has lost the right to receive a de novo appeal of the final judgments in the 1,100 Acres case, but will proceed through the state Court system in an effort to be heard regarding the defective judgments obtained through violations of their civil and due process rights.

289.    On September 16, 2011, Lipin and Pierron filed for Chapter 11 bankruptcy protection and a hearing was held during which special counsel Janet Spears ("Spears") notified Judge Olson of the bankruptcy filing. After Ms. Spears' withdrawal as counsel was approved and she was released from the hearing, the court set a date for another status review on October 4. The Court did not notify Ms. Spears of the hearing date set, nor did it notify existing attorney of record Mr. Strohm, nor the Plaintiffs, in violation of Ariz.R.Civ.P., Rule 5(a), as well as in violation of Plaintiffs' rights to due process guaranteed under both the U.S. and Arizona Constitutions.

290.    On October 4, 2011, Loucks and Cohen of MC&R presented a Bankruptcy Memorandum to Judge Olson that was not disclosed to Plaintiffs nor their Counsel prior to the status conference held that day, thereby depriving Counsel of an opportunity to respond.

80

Instead, the memorandum was mailed only to Plaintiffs on the day of the hearing, and they received it in the late afternoon on October 5, 2011. The court held an *ex parte* hearing with Loucks and Keating and in the absence of any representation of DPC and Ranch.

291.    The court's order from October 4, 2011 set a date for compelling document production and setting depositions with an additional status conference set for the same day on October 18. Although Strohm immediately requested the court reset that deadline, Plaintiffs allege that in joint actions, Judge Olson arranged it so that any motions filed by Plaintiffs would have no effect because the production would have to occur before any arguments would be heard against the production. Rather than risk being found in contempt and subject to severe sanctions, Plaintiffs turned over their records to the Defendants.

292.    Judge Olson was complicit in proceeding without the Plaintiffs being notified or represented at the hearing. The Pinal County Superior Court, over which Judge Olson presides, has been responsible for a pattern of lack of notice to Plaintiffs and their counsel. This has occurred too repeatedly and consistently to be attributed to mere negligence.

293.    On November 4, 2011, debtor depositions were held at the offices of MC&R for the purpose of deposing Lipin and Pierron as managing members of DPC and Ranch LLCs. The deposition questions had little if anything to do with the discovery of the current assets of DPC and Ranch. When questions were asked relating to this case, in violation of Fed.R.Civ.P. 26(a)(2) and 30(a)(2) governing discovery, it became a deposition in this case and the Chapter 11 cases done without leave of this Court and prior to the scheduling conference.

# FIRST CAUSE OF ACTION

## FEDERAL RICO CLAIM UNDER 18 U.S.C. § 1962(c)

### Against All Defendants

294.    Plaintiffs hereby incorporate by this reference each and every allegation above as if fully set forth herein paragraphs 1 through 293.

295.    Defendants violated 18 U.S.C. §1962(c) by associating with an enterprise that engaged in a pattern of racketeering activity.

296.    Plaintiffs, The Parsons Co., Inc., Joseph M. Parsons, Clay H. Parsons, The Walker Ranches LLLP, Gary Walker, Georgia Walker, Eve R. Walker, The Estate of Robert W. Walker, Walker Family Ranch Trust, Albert Yendes, Geoffrey Brimhall and Louis Puroll, Kevin Keating, Paul Loucks, Melvin Cohen, The Keating Law Firm, PLC, and Mesch Clark & Rothschild, PC, are each "persons" as that term is defined in 18 U.S.C. §1961.

297.    At all relevant times Defendants conducted the affairs of a certain association-in-fact enterprise identified herein, the affairs of which affected interstate commerce through a pattern of racketeering activity.

## A.    Defendants Formed an Association-in-Fact RICO Enterprise

298.    For purposes of this claim certain RICO enterprises are associations-in-fact within the meaning of 18 U.S.C. §1961(4) consisting of the Defendants and including their employees, agents, and the persons listed in Paragraph 26 of this Complaint collectively referred to herein as "The Enterprise." The Enterprise is an ongoing and continuing organization consisting of corporations, Limited Liability Companies, government agencies and individuals that have been associated for the common or shared purpose to 1) deprive

Plaintiffs of their rights to property and to obtain said property and improvements with its increased value through illegal means including denial of due process rights, the destruction of their businesses, and the inability to financially defend themselves from those actions as those acts are identified in this Complaint; 2) implement the scheme; and 3) achieve economic benefits from the potentially lucrative opportunities for development in the area of the Picacho Mountains and acquiring Plaintiffs' 1,100 Acres and 30 Acres, with its rich water resources.

299.    The Walker and Parsons Defendants implemented the scheme in or about September 2007.

300.    The Enterprise functioned as a continuing unit as evidenced by the coordination of activities between Defendants including Yendes traveling between Colorado and Arizona to coordinate with the Parsons, and coordination between the attorneys in their legal attacks on Plaintiffs. When issues arose during the scheme, each Defendant agreed to take action to hide the scheme and continue its existence.

301.    Beginning in September 2007 through the present, Joseph Parsons, Clay Parsons, and Gary Walker conducted, operated, managed, participated in, engaged in, conspired to engage in, or aided and abetted the conduct of the affairs of the Enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1), 1961(5) and 1962(c). All of the predicate acts described in this complaint were continuous and had become the Enterprise's way of doing business.

302.    These acts all occurred after the effective date of The Racketeer Influenced and Corrupt Organizations Act and more than two such related acts occurred within ten years of

each other.

**B.      The Enterprise Affected Interstate Commerce**

303.    The Associated-in-Fact Defendants conducted or participated, directly or indirectly, in the conduct of the Enterprise's affairs through a pattern of racketeering activity that affected interstate or foreign commerce. The Enterprise operates across state lines. Any act carried out by all Defendants, and/or each of them, that is in violation of 18 U.S.C. § 1962(d) or performed on behalf of the Enterprise is alleged to be an act of interstate activity(s) having an effect on interstate commerce.

304.    In the development of the 1,100 Acres, DPC and Ranch intended to create a sustainable farming and nursery operation, carry out several humanitarian service projects, and start several commercial projects that were interrelated, with the intent to sell products in interstate and foreign commerce.

305.    The acts of extortion and conspiracy to illegally force and obtain the properties and to cause business interference by the Enterprise who were directly and customarily engaged in commerce, and interstate commerce as defined in 18 U.S.C. §1951(b)(3). The Defendants created an environment of violence including arsons and aggravated assault with a deadly weapon, and caused the withdrawal of services and other predicate acts that seriously interfered with Plaintiffs' ability to engage in commerce. This prevented Conservancy and Kesselring from developing their businesses by denying them the opportunity to derive income from their businesses and obstructed and adversely affected their ability to engage in commerce. Further, the Defendants depleted the resources of and destroyed the assets of the Plaintiffs and forced them to engage in extended and complex litigation.

**C.**     **Extortion**

a.     Defendants have engaged in racketeering activity as defined in 18 U.S.C. § 1961 (1) (B) by means of extortion and which is also chargeable offenses under state law punishable by imprisonment for more than 1 year under A.R.S. § 13-1804, *et seq.* by their conduct in engaging in "racketeering activity", including but not limited to as follows:

b.     As fully set forth in paragraphs 60, 64, 81, 82, 109, 159, 160, 176, and in violation of A.R.S. §§ 13-1804(A)(1)(2), Defendants engaged in threats to physically injure Plaintiffs, employees, associates and agents should Plaintiffs not accede to the Enterprise's demands such as provide a cattle easement to Parsons that would completely destroy Plaintiffs' interests in the land and cease all litigation activities, for the specific purpose of obtaining the land from Plaintiffs with little or no money being paid to Plaintiffs.

c.     As fully set forth in paragraphs 60, 64, 81, 82, 109, 159, 160, 176 on multiple occasions in violation of A.R.S. §13-1804(A)(3), Plaintiff threatened to damage fences, damage other property by driving cattle across the property, and cause other injuries to the property of Plaintiffs, and in fact did take these actions in seeking to obtain control over the 1,100 acres and financially harm Plaintiffs.

d.     As fully set forth in paragraphs 69-74, in violation of A.R.S. § 13-1804(A)(5), Puroll facilitated the Enterprise's instigation of a baseless homicide investigation on Plaintiffs' property in 2007 and entered without consent onto Conservancy's property, conducting a warrantless search, and thereby asserting

85

control over the 1,100 Acres in aid of the Enterprise's design to force the Plaintiffs to surrender their property.

e.      As fully set forth in paragraph 104, in March 2008, in violation of A.R.S. § 13-1804(A)(5), Joseph Parsons' threat caused Plaintiffs' employee to resign, causing damage to Plaintiffs' property and businesses and depriving the Plaintiffs of their assets by depriving them of a method of preserving said assets.

f.      As fully set forth in paragraphs 238-240, in violation of A.R.S. § 13-1804(A)(5), operating openly on behalf of the Enterprise, Puroll on April 12, 2010 falsely accused Plaintiffs of crimes including theft and attempted murder, which were being perpetrated against Plaintiffs and their employees. Puroll told Plaintiffs' contractor that Plaintiffs were setting him up and trying to get him killed to make the Parsons look bad. As part of the scheme, Puroll attempted to intimidate and convince Plaintiffs' contractor to abandon his post, which would enable the Enterprise to have its way on Kesselring's unprotected 30 Acres.

g.      As fully set forth in paragraphs 47, 49, 51, 92, in violation of A.R.S. § 13-1804(A)(7), Parsons made threats that he would get various state and local agencies to take adverse actions if Conservancy did not give in to his demands, which would destroy their interest in the properties and did cause public servants to improperly and take actions adverse to Conservancy, or withhold services from Plaintiffs when his demands were not met. These agency actions placed a huge financial burden on Plaintiffs.

h.    In violation of A.R.S. § 13-1804(A)(8), Defendants perpetrated their pattern of threats, trespassing, destruction, thefts, and intimidation towards Kesselring in the same way that they had with Conservancy. Destruction of the bridge flooded Kesselring's easement, thus destroying her access and at the same time, ditches on state land leased by Parsons were dug to flood out Pecan Road, completely eliminating access to and from the properties. The Enterprise has free reign to steal and/or destroy whatever it wants on Kesselring's 30 Acres, which actions have been fully set forth in paragraphs 158, 160 278, with the intent to take it over.

i.    This continual onslaught of theft, extortion, destruction of property, trespassing of cattle, and agency complaints by Enterprise meant that Plaintiffs' businesses were in constant jeopardy because of this extreme interference by the Enterprise which affected interstate commerce.

**D.    The Enterprise Engaged in a Pattern of Racketeering Activity, Consisting of Mail and/or Wire Fraud Violations**

306.   For the purpose of executing the scheme or artifice to defraud, or for obtaining money or Plaintiffs' property by means of false or fraudulent pretenses, Defendants placed in post offices or authorized depositories for mail, matters, or things to be sent or delivered by the U.S. Postal Service or other private or commercial interstate carriers in violation of 18 U.S.C. § 1341[6], as set forth above and as follows:

---

[6] Using the mail to execute or attempt to execute a scheme to defraud is indictable as mail fraud, and hence a predicate act of racketeering under RICO, even if no one relied on any misrepresentation. See *Neder v. United States,* 527 U.S. 1, 24-25, 119 S.Ct. 1827 (1999). A plaintiff asserting a RICO claim predicated on mail fraud need

a.     As fully set forth in paragraph 83, on or about December 3, 2007, on behalf and under the direction of the Enterprise, ASLD Trespass Investigator, Bradley Geeck, committed mail fraud, by mailing Plaintiff AWD Ranch, LLC and seven additional parties, including Defendant Puroll, ASLD, ASM, CAP, ADWR, the U.S. Army Corps of Engineers, and Elise Moore of PCFC, a warning letter falsely alleging that Plaintiffs were using an unauthorized route across state lands access to the 1,100 Acres. An altered map was attached that could have been provided by Walker, Yendes, and/or Parsons. The map did not accurately reflect the route Conservancy used to access the 1,100 Acres. This led to a shutdown of Plaintiffs use of the land by PCFC.

b.     As fully set forth in paragraphs 94, on or about January 6, 2008, in furtherance of the Enterprise's scheme and artifice to defraud, Defendant Gary Walker committed fifteen predicate acts of mail fraud. With the intent to deceive and manipulate the recipients, Walker sent fraudulent complaint letters to fifteen different county, state, and federal agencies. Based upon this baseless letter, Plaintiffs were subjected to additional agency investigations, which adversely affected their ability to conduct business, further impacting interstate commerce. The purpose of the letters being sent over three months after the Walkers' disclosure of these agencies as witnesses was to further harm Plaintiffs by aiding

---

not show, either as an element of its claim or as a prerequisite to establishing proximate causation, that it relied on the defendant's alleged misrepresentations. *Bridge v Phoenix Bond and Indem Co,* 553 U.S. 639, 128.

the fraudulent scheme of the Enterprise to interfere with Plaintiffs' businesses. These mailings did deceive the recipients and were concealed and not disclosed in litigation until on or about May 22, 2008.

c.      As fully set forth in paragraphs 110, on or about April 7, 2008, in another act of fraud using the mail and/or wire on behalf of the Enterprise, Elise Moore mailed a PCFC report to Conservancy and Gookin with an extensive task list that would require Conservancy to pay fees and take actions not required by statute or agency rules. Such a report and was outside of the scope of her or PCFC's authority. As an Associated-in-Fact member of the Enterprise, the only purpose for this contrived task list was to intimidate and harm Conservancy and keep them from proceeding with any planned projects on the properties. This fraudulently kept the stop-work order PCFC had previously issued in place. The Enterprise intended for the demands of this department to further prevent Plaintiffs from developing their businesses. This pattern of specific actions as executed by Moore through the use of the mail conspiracy by acting beyond her authority and using the mail and/or wire to commit fraud—a step in the plot that would benefit only the Enterprise.

d.      As fully set forth in paragraph 117, on or about July 1, 2008, Cohen and Loucks, in an incident essential towards continuing the scheme to defraud, committed mail fraud by use of the U.S. Postal Service when sending a copy of Parsons' Motion for Summary Judgment to Conservancy's counsel. Cohen and Loucks knew or should have known that this document contained material

misrepresentations. The motion referenced the fraudulently obtained Certificate of Grand-fathered Water Rights for the stockpond on the land Parsons purchased from the Walkers. The motion fraudulently stated that the stockpond was the only certified water in the area he could use for cattle and that the purpose of the easement was to get the cattle to this certified water. Attached to the motion was Brimhall's affidavit prepared by MC&R and later admitted to be false. By signing this affidavit he knew or should have known to be false, Brimhall clearly indicated his willful participation in the Enterprise. Cohen and/or Loucks's act of mail fraud, with Brimhall as a co-conspirator after the fact, makes each of these Defendants culpable for the use of the U.S. Postal Service for the purpose of executing the scheme to defraud Plaintiffs DPC and Ranch.

e.      As fully set forth in paragraphs 117 and 126, in a further effort to continue the Enterprise's racketeering activity, an additional incident of mail fraud in the essential part of the scheme to defraud by Cohen and Loucks included a map they knew or should have known to be fraudulent, attached to Parsons' Motion for Summary Judgment. Cohen later admitted the map was false and not representative of the existing location of the easement, after it had been represented to and relied upon by the Court.

f.      As fully set forth in paragraph 124, on or about September 18, 2008, Parsons, Cohen, and Loucks committed another act of mail fraud when they sent a mailing to Conservancy's Counsel, Kevin Bumstead. In another step in the plot to defraud and continue the Enterprise's racketeering activity, Parsons' Second Amended

Complaint falsely alleged wrongful diversion and unlawful appropriation of water and two other counts based on the illegally "certified" stockpond and, therefore, fraudulent "superior" water rights. This fraudulent act allowed the Enterprise to bring Conservancy's investors into the case as a new party, harming the relationship between Conservancy and Farms. Conservancy and their investors were burdened with additional legal fees as the Enterprise attempted to damage and financially ruin them, and create a false impression of wrongdoing on the part of Conservancy. This scheme lent credibility to the Enterprise's fraudulent claims with the Court and agencies it had influenced under false pretenses to investigate and even shut down Conservancy's properties, while diverting attention away from the fact that the Enterprise had no legitimate water claim there in the first place.

g.     As fully set forth in paragraph 187, on November 25, 2009, Defendants Cohen, Loucks, and MC&R, mailed fraudulent responses to NUIs to Conservancy's Counsel, Steven Rensch, and with the knowledge that the responses were material misrepresentations of fact. This mailing was incident to the essential part of the scheme in furtherance of the Enterprise's racketeering activity.

h.     As fully set forth in paragraph 188, Keating, as an agent for the Enterprise, committed mail and/or wire fraud by mailing and emailing Walkers' fraudulent responses to Conservancy's NUIs on November 30, 2009 to Conservancy's Counsel, Rensch, to continue the scheme to defraud and the Enterprise's

91

1  racketeering activity. After having openly admitted to be working in concert with

2  Cohen and Loucks, Keating knew or should have known that Walkers had

3  knowledge of the pond's construction and that submitting responses that denied

4  any knowledge its construction was a concealment of this fraud.

5

6        i.      As fully set forth in paragraph 278, Keating, in a predicate act of mail and/or

7  wire fraud on or about December 30, 2010, mailed and emailed a letter to

8  Conservancy's counsel, Strohm, stating that Kesselring cannot use her easement

9  and that no one associated with Conservancy or Kesselring can even set foot on

10  the 1,100 Acres or else be prosecuted for criminal trespass. This letter was another

11  step in the plot of the Enterprise's scheme and racketeering activity to illegally

12  obtain control of Kesselring's 30 Acres.

13

14  307.    Defendants transmitted or caused to be transmitted by means of wire communication

15  in interstate or foreign commerce, writings, signs, signals, pictures, or sounds for the

16  purpose of executing such scheme or artifice, as set forth above, in violation of 18 U.S.C. §

17  1343, as set forth above and as follows:

18

19        a.     As fully set forth in paragraph 217, according to billing records produced by

20  Keating, from August 2008 to May 2010, Albert Yendes, who was residing in

21  Colorado,  had telephone communication with Keating, who was located in

22  Arizona, and sent emails to and received emails from him,  using the wires in the

23  furtherance of the Enterprise's scheme to defraud Plaintiffs and continue the

24  racketeering activities of the Enterprise, with the specific intent to deceive and

25  defraud Plaintiffs.

b.    As fully set forth in paragraph 193, according to billing records produced by Keating, from August 2008 to May 2010, Gary Walker, who was residing in Colorado, sent emails to and received emails from Keating who was located in Arizona,  had telephone communication with Keating, who was located in Arizona, and sent emails to and received emails from him,  using the wires in the furtherance of the Enterprise's scheme to defraud Plaintiffs and continue the racketeering activities of the Enterprise, with the specific intent to deceive and defraud Plaintiffs.

c.    As fully set forth in paragraphs 215 and 264, in a predicate act of wire fraud, Yendes contacted a web designer and his attorney making false assertions that were later disclosed on or about February 15, 2010 in a separate and unrelated lawsuit involving AEA. These false assertions by Yendes were received by AEA in responses to NUIs. Yendes conspired with and is participating with the Enterprise to commit wire fraud in the scheme to illegally force Kesselring off her land and then obtain the 30 Acres. Yendes' act was directed against Kesselring and her business partner. The immediate result was that Kesselring withdrew as a member of AEA because of the concern of harm to the business and its members.

**E.    Interstate Travel in Aid of Racketeering**

308.    In violation of 18 U.S.C. § 1952, Yendes, employed as a member of the Enterprise, conspired, aided and abetted, and carried out predicate acts of racketeering by traveling from Colorado to Arizona in the commission of illegal acts by conducting activities as fully set forth in the factual allegations above and incorporated by reference and specifically

93

paragraphs 59, 63, 68, 105, 131, and155.

**F.      Obstruction of Justice**

309.    As fully set forth in paragraph 230, on April 8, 2010, in violation of 18 U.S.C §1503(a) and A.R.S. §§ 13-1804(A)(1)(2), Rensch was threatened by Joseph Parsons to intimidate him into withdrawing from his representation of Plaintiffs at a critical appellate juncture in their case as part of the racketeering scheme. As an attorney, Steven Rensch is an officer of the court, and therefore, such activity constitutes obstruction of justice.

**G.      Witness Tampering, Arson, and Violent Crimes in Aid of Racketeering in Aid of the Scheme**

310.    Defendants conduct constituted a scheme to obtain money, funds, or other property under the custody or control of Plaintiffs, in that they attempted to hinder, delay, prevent, and/or dissuade Plaintiffs, their agents, witnesses, and employees from testifying in official proceedings and/or moving forward with their lawsuit, in violation of 18 U.S.C. §§ 1512 and 1513, by conducting the following activities as fully set forth in the factual allegations above and incorporated by reference and including but not limited to:

  a.      As fully set forth in paragraphs 148, 160, 165, 170, and 171, intentionally diverting water in August 2009, successfully designed to destroy the bridge and, with it, Conservancy's access and Kesselring's easement. Keating attempted to influence the court to void Kesselring's easement in a case she was not a party to. Keating demanded that no repair of the bridge be performed, to deny Plaintiffs access to the properties, which legally were still in the possession of Plaintiffs. These acts were designed to intimidate the witnesses and prevent Kesselring from

1    filing her lawsuit and prevent the introduction of any evidence in legal

2    proceedings.

3        b.    As fully set forth in paragraphs 225, 226, and 237, on April 6 and 7, 2010,

4    the Enterprise's two shootings at Contractor 1 were carried out just before an

5    important hearing on Conservancy's Motion for Change of Judge for Cause. In an

6    extreme effort to intimidate Conservancy, their witnesses, and their attorney, the

7    Enterprise's actions were intended to dissuade any witnesses from testifying on

8    behalf of Plaintiffs thereby obstructing Plaintiffs' ability to litigate their cases

9    pending before the Pinal County Superior Court. These actions were also intended

10   to prevent Plaintiffs from preserving evidence, by removing the personnel on the

11   land, and to leave valuable assets vulnerable to theft or destruction.

12

13   311.   In a solid week of violence and threats against Plaintiffs, Defendants' conduct

14   constituted a scheme designed to drive Plaintiffs off of the 1,100 Acres and 30 Acres.

15   Through predicate acts of witness tampering and retaliation in violation of 18 U.S.C. §§

16   1512 and 1513, arsons in violation of 18 U.S.C. § 1961(1)(A) and A.R.S. §§ 13-1703 and

17   13-1704, and violent crimes in aid of racketeering activity in violation of 18 U.S.C.A. §

18   1959 Plaintiffs had been shot off the property. An orchestrated conspiracy and pattern of

19   racketeering activity among members of the Enterprise was demonstrated as follows.

20       a.    As fully set forth in paragraphs 225, 226, and 237, Plaintiffs' contractor was

21   attacked, two days in a row, by gunfire that originated from property controlled by

22   the Parsons Defendants, to frighten and intimidate him into quitting;

95

b.     As fully set forth in paragraphs 237-239, influenced law enforcement to ignore the aggravated assault with a deadly weapon and to fail to investigate, and to permit them to act outside the law without fear of retribution or accountability;

c.     As fully set forth in paragraphs 230 and 247, threatened the lives of Plaintiffs' attorney and his family, causing him to quit the case, leave Plaintiffs with no attorney, and destroy Plaintiffs' vested interest in Rensch;

d.     As fully set forth in paragraph 228, within hours after the second shooting attack, erected and installed a very large custom gate and lock system, blocking many gates denying Plaintiffs access to their properties. Only those who had conspired with the controller of the keys to those gates and locks had reasonable access to the 30 Acres, allowing the Enterprise unfettered access to and complete control of the properties. This enabled further unlawful and harmful acts to be carried out against Plaintiffs without any interference or risk of discovery in order to perpetrate the arsons and to plant snipers in the hills;

e.     As fully set forth in paragraph 233, ransacked Kesselring's dwellings and stole the contractor's and Plaintiffs' belongings to further intimidate them;

f.     As fully set forth in paragraphs 241 and 242, the four separate arson fires committed on Kesselring's 30 Acres by the Enterprise, damaged buildings, ironwood trees, and additional property used in Kesselring's business, effectively halting her business for the sale of root crops intended to be sold in interstate and foreign commerce. Further these arsons were perpetrated with knowledge that there was no one present on the property. The arsons destroyed all the uninsured

96

living dwellings and more property, information that was known to the Defendants, with the knowledge that Plaintiffs would not have the financial resources to replace those dwellings in time to continue the spring planting project and harming Kesselring's joint venture partners who had already invested enormous resources into the project.

g.     As fully set forth in paragraph 236, on April 12, 2010, when Plaintiffs' contractors attempted to return to the property, snipers acting on behalf of the Enterprise lay in wait to attack again with gunfire;

h.     As fully set forth in paragraph 248, on April 21, 2010, a potential fourth attack was thwarted when Plaintiffs' Contractor and a private investigator spotted persons, believed to be armed, laying in wait overlooking Kesselring's property.

312.   The fires and final shootings took place on the morning of the trial being held without regard for of the rules of civil procedure to ensure that Plaintiffs and their attorney would not appear. Law enforcement not only refused to investigate the third shootings and the arsons, and blatantly threatened Plaintiffs and their contractor that to request help in Pinal County would result in fines. These actions were to make sure that Plaintiffs would not attend the trial, would "get the message" that the Enterprise was in control of all of their properties, that if they continued to fight to access their land they would risk being killed, that no one would work for Plaintiffs under the threat of being shot at, and that no law enforcement protection would be provided to them in Pinal County.

313.   Finally, the Enterprise successfully procured judgments unjustly enriching themselves with the fixed land assets obtained with the 1,100 acres, effectively in control of

Kesselring's 30 acres, and numerous remaining assets she abandoned under the Enterprise's violent attacks.

314.    The Enterprise controlled all the land surrounding the properties and no one else had the interest or stood to benefit from, had the motive, or the opportunity to carry out such a corrupt series of predicate acts all intended to intimidate, harm, and destroy Plaintiffs' businesses and their legal defense, in order to take over their valuable properties and assets thereon.

315.    Defendants' illegal acts as described in this Complaint occurred from 2007 until the present and constitute a pattern of racketeering activity under 18 U.S.C. § 1961, *et seq*. The activities specifically targeted Plaintiffs and/or their agents and employees and only benefited the Defendants.

**H.    Damages Caused by the Enterprise's Scheme**

316.    As a direct and proximate result of Defendants' illegal conduct Plaintiffs have been injured and suffered monetary damages by the 1) loss of business opportunities, 2) loss of businesses, 3) conversion of property, (i.e., fixed land assets not considered in determining deficiency judgment, 4) destruction of property, 5) loss from theft, 6) loss of real property, 7) legal fees and costs, and 8) Defendants have been unlawfully enriched to the detriment of Plaintiffs by reason of Defendants' violations of 18 U.S.C. § 1962, in an amount to be determined at trial.

**SECOND CAUSE OF ACTION**

**CIVIL RICO CONSPIRACY UNDER 18 U.S.C. 1962(d)**

317.    Plaintiffs hereby incorporate by this reference each and every allegation above as if

98

fully set forth herein and specifically paragraphs 1 through 316.

318.    Each and every Defendant conspired in some way or manner with one another to violate the provisions of 18 U.S.C. § 1962(c), and, thereby, 18 U.S.C. § 1962(d), and each and every Defendant reached a mutual understanding and agreement to attempt to accomplish a common purpose, through implementation of unlawful concerted conduct.

319.    Each and every Defendant knowingly and willingly became a member of a conspiracy by objectively indicating, through his or her words or actions, his or her agreement to conduct or participate, directly or indirectly, in the Enterprise through a pattern of racketeering activity.

320.    Each and every Defendant worked together to commit illegal acts that they alone could not accomplish. Each and every Defendant cumulatively conducted the Associated-in-Fact Enterprise's affairs for some unknown benefit and for the benefit of the Enterprise.

321.     Each of the Defendant Conspirators committed at least one overt act during the existence of a conspiracy in an effort to accomplish the purpose of the conspiracy.

322.    Defendants individually or as a group commenced and have pursued a conspiracy, common enterprise, and common course of conduct to the present day as stated in the facts laid out herein above all in violation of 18 U.S.C. § 1962(d) including but not limited to the following actions:

323.     Josephs Parsons had on several occasions claimed control of the law enforcement, County Attorney, and Judges in Pinal County. Many of the predicate acts could have occurred only with the cooperation of the courts and law enforcement agencies and with influence over employees of state agencies. Yendes, as shown herein, was working

with Parsons. Puroll indicated his participation by granting Parsons access to the property under the guise of investigating a possible homicide and granting Parsons the access he needed to aid in his false complaints to the various state agencies. Puroll further participated by leading the investigators from the various agencies through the fence that had been destroyed by the Enterprise, and also harassed Plaintiffs' contractor when he tried to report violent crimes. Puroll further concealed the acts of the Enterprise by his refusal to properly file reports regarding his activities while acting under color of law. Clay Parsons and Yendes conspired together by jointly leading a state investigator to fuel tanks that were above ground but had been buried by the Enterprise to appear to be underground and thus subject to state regulation. The law firm of MC&R and specifically Cohen and Loucks committed multiple acts to aid the Enterprise by such actions as preparing a false affidavit for signature by Brimhall and by bringing allegations before the Court that they knew or should have known were false including but not limited to the fraudulently certified stock pond, the false maps allegedly showing the easement, and numerous other actions. Brimhall showed his participation by signing the affidavit prepared by MC&R that he knew or should have known was false. Further, Brimhall permitted a survey to be done in his name for which he was not present. MC&R submitted the survey to the Court knowing that Brimhall had not performed it as ordered. Keating, Cohen, and Loucks had *ex parte* and other improper communications with Judge Olson. The other defendants as shown in the facts set forth herein above were either in the direct employ of or under the influence of the Walkers and/or the Parsons, and their actions were clearly to the benefit of the Enterprise as a whole.

## A.     Damages Caused by the Scheme

324.    Plaintiffs were damaged in their business and their property in that it lost property, businesses, business opportunities, and a significant amount of funds invested in the businesses and property due to the Scheme of the Enterprise.

## THIRD CAUSE OF ACTION

## VIOLATION OF CIVIL RIGHTS UNDER 42 U.S.C. § 1983

### Against Defendants The Parsons, The Walkers, Cohen, Loucks, Mesch Clark & Rothschild, Keating, The Keating Law Firm

325.    Plaintiffs hereby incorporate by this reference each and every allegation above as if fully set forth herein paragraphs 1 through 324.

326.    Joe Parsons, Clay Parsons, The Parsons Co., Inc., Gary Walker, Walker Ranches LLLP, Cohen, Loucks, Mesch Clark & Rothschild P.C., Keating, The Keating Law Firm, (collectively referred to as "Defendants" in this section) acted under of color of law in joint action with Judge Robert Carter Olson and others at his direction, to deprive Plaintiffs of their constitutional rights to their property and due process by not following all of the legal procedures set forth by statute and court rule treating them unequally with prejudice. Defendants deprived them of their right to own property by destroying their interests in said property in order to improperly obtain financial gain under false means.

327.    Defendants acted under color of state law,[7] using 1) named individual Defendants' law licenses and/or other professional licenses as well as 2) the avenues for conducting

_____

[7] *Tulsa Professional Collection Services, Inc. v. Pope*, 485 U.S. 478, 108 S.Ct. 1340 (1988) (the Fourteenth Amendment only protects property interests from deprivation by state action; private use of state sanctioned private remedies or procedures does not rise to level of state action but when private parties make use of state procedures with overt, significant assistance of state officials, state action may be found).

business provided by the Arizona Corporation Commission. Professional licensees, such that defendant attorneys Keating, Cohen, and Loucks, are liable for violations of 42 U.S.C. § 1983. A professional license or government position is not a vehicle immunizing the license holder from its prohibited use. *See, e.g., Kimes v. Stone,* 84 F.3d 1121 (1996).

328.    Defendants, jointly engaged with state officials in prohibited activity, were acting under color of law to willfully deprive Plaintiffs of their rights, privileges, or immunities secured or protected by Constitution or laws of the United States.

329.    Four different tests are to be used to identify state action: "(1) public function; (2) joint action; (3) governmental compulsion or coercion; and (4) governmental nexus." *Id.* citing *Sutton v. Providence St. Joseph Med. Ctr.*, 192 F.3d 826, 835-36 (9th Cir. 1999); *Lee v. Katz,* 276 F.3d 550, 554 (9th Cir. 2002). Satisfaction of any one test is sufficient to find state action, so long as no countervailing factor exists. *Lee, supra*, at 554.

330.    The Fourteenth Amendment guarantees the right of procedural due process protecting individuals from erroneous or unjustified deprivations of life, liberty, or property, and assures them that the government deals with them fairly. *Carey v. Piphus,* 435 U.S. 247, 259, 262, 98 S.Ct. 1042, 1050, 1051 (1978).

331.    To determine whether actions that allegedly caused the deprivation of a right are fairly attributable to the state even though they were committed by private actors, we follow a two-part approach: "First, the deprivation must be caused by the exercise of some right or privilege created by the State or by a rule of conduct imposed by the state or by a person for whom the State is responsible." *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 937, 102 S.Ct. 2744, 2753 (1982). "Second, the party charged with the deprivation must be a person who

may fairly be said to be a state actor." *Id*.

332.     Defendants unlawfully conspired to injure, oppress, threaten, and intimidate Plaintiffs, causing the deprivation of Plaintiffs' rights and privileges secured to them by the Constitution. As a result, Defendants caused Plaintiffs to be subjected to the deprivation of their rights as secured by the laws of the United States and the Constitution. Defendants sought to unilaterally deprive Plaintiffs of their constitutional property and due process rights to improperly obtain financial advantage under false pretense.

333.     Once Defendants sought to act without legal authority, by enlisting governmental agencies, courts, judges, commissioners and law enforcement and becoming joint actors with the State Actors (specifically Judge Olson and the variety of state agencies that conducted investigations into Plaintiffs and related business based upon sham and fraudulent claims by Defendants), Defendants' acted (and are acting) under color of state law and have deprived Plaintiffs of a right secured by the Constitution, namely their Constitutionally guaranteed right to due process under the 14th Amendment to the Constitution. Defendants have acted and will continue to act under color of state law in order to continue to deprive Plaintiffs of their constitutionally guaranteed rights.

334.     Plaintiffs allege that state actors caused a deprivation of a federal right, and also that the Defendants, as private entities, jointly engaged with the direct and/or indirect assistance of several state courts and agencies, to deprive Plaintiffs of their constitutional rights to liberty, property and due process, by denying Plaintiffs the right to access and use of their property and thereby depriving them of their property without adhering to the Constitution of the State of Arizona or U.S. Constitution.

335.    Kesselring was a third party who was adversely affected by the joint action alleged herein against Conservancy, which violated her Fourteen Amendment rights and, therefore, she joins in this action to protect her own rights. Kesselring will also be irreparably harmed by the ongoing conduct by Defendants and the Enterprise in the 30 Acre case, currently pending in Pinal Superior Court, involving the same parties and attorneys. *See Edmonson v. Leesville Concrete Co., Inc.*, 500 U.S. 614, 111 S.Ct. 2077 (1991) (a litigant may raise a constitutional claim on behalf of a third party if litigant can demonstrate that he or she suffered a concrete, redressable injury, that he or she has a close relationship with third party, and that there exists some hindrance to the third party's ability to protect his or her own interest).

336.    As evidenced by email correspondence with Judge Olson and one another, conversations on the record in open Court with Counsel and as reflected in billing statements filed by Defendant Keating in his September 18, 2009 and May 7, 2010 applications for attorney's fees, Defendants acted in concert with Judge Olson and one another to deny Plaintiffs' 14th Amendment due process rights by, including but not limited to, either directing or improperly influencing Judge Olson's rulings and judgments, intentionally misleading the Court with fraudulent statements, communicating with the Court *ex parte*, filing fraudulent and/or sham documents with the Court, and failing to properly notice actions to be taken and/or taken against Plaintiffs, all of which actions were approved by and/or undertaken by Judge Olson. Defendants and Judge Olson have

undertaken the following adverse actions[8] against Conservancy, which actions have also

violated the due process rights of Plaintiffs Kessel Farm LLC and Loraine Kesselring, as

follows.

      a.    Despite the Court allowing Parsons and Walkers to freely amend their

pleadings, Conservancy was required to file a Motion for Leave to Amend. Six

months later on March 9, 2009[9], Judge Olson denied the Motion for Leave to

Amend ruling despite multiple reminders to the Court of the pending motion. This

failure of the Court to allow Plaintiffs to amend their complaint at the behest of

Defendants and their attorneys, and the denial of Plaintiffs' later motion for leave

to amend filed in January 2010 as well stating it would unduly prejudice the

Walkers and Parsons prevented Conservancy from asserting crucial elements of

fraud surrounding the certification of the stockpond, which further impaired

Plaintiffs' rights;

      b.    On June 16, 2009, Judge Olson ruled on an unnoticed oral motion to

bifurcate trial issues he identified as having been  raised by Loucks during a status

conference, when Cohen was on the phone.  Judge Olson granted the motion

immediately and he failed to allow Plaintiffs an opportunity to properly respond to

---

[8] This list is not exhaustive.

[9] Every matter submitted to a judge of the superior court for his decision shall be decided within sixty days from the date of submission thereof. The supreme court shall by rule provide for the speedy disposition of all matters not decided within such period. (Arizona Constitution, Article 6, Section 21 and The Arizona Code of Judicial Conduct, Canon 2, Rule 2.5, Comment 5).

the motion he thereby denied Plaintiffs the protections authorized under the Rules of Civil Procedure, in violation of their rights to due process;

c.      Judge Olson struck in its entirety Conservancy's response to Defendant Walker's Motion for Summary Judgment based upon one disputed fact. He abused his discretion by failing to make any specific findings that the claims were sham and should not have struck the entire response.[10] Further, despite evidence to the contrary, Judge Olson accepted the entirety of Defendants' motions as true. These acts effectively denied Conservancy any defense in the case and denied them their rights to be heard;

d.      Keating's August 24, 2009 email to Judge Olson contained extrajudicial, prejudicial statements and requested that the Court essentially void the easement Kesselring had over the 1,100 Acres, even though Kesselring was not a party to the 1,100 Acres case. This *ex parte* communication severely impacted Kesselring's due process rights and property interests in the 30 Acres case (as well as her ability to use the 30 Acres) by attempting to influence the judge to enter a ruling affecting Kesselring when the court had no jurisdiction to do so, thereby denying her right to due process;

e.      Plaintiffs were not made aware of the Fidelity lawsuit until 2010 and were not aware of the contact between Judge Olson and Judge Borek until very recently,

---

[10] "[A]s a general rule, motions to dismiss or to strike pleadings 'as sham under 11 should not be granted if there is any possibility that the party can prove his case.'" *See, e.g., Boone v. Superior Court In and For Maricopa County,* 700 P.2d 1335, 145 Ariz. 235 (Ariz., 1985).

when they read the filings. Because the Defendants and Judge Olson have agreed to keep the terms of the settlement confidential, Plaintiffs have not been able to determine any potential offset for damages against the Parsons' judgments obtained against Conservancy.

f.      Judge Olson prepared a judgment that was, according to Court records, signed on December 7, 2009. The Rules of Civil and Appellate Procedure state that the time to notice an appeal starts running on the date when the judgment is signed.

g.      On January 4, 2010, counsel for Parsons and Walkers acquired a copy of the judgment. Neither attorney notified Plaintiffs that the judgment had been issued. Keating immediately began preparing documents to start the foreclosure process. No notice was mailed to Plaintiffs' counsel until January 8, 2010, denying for a month Plaintiffs the knowledge that the judgment had been signed.  . This delay denied Plaintiffs their due process rights. Conservancy had to request that the court reinstate their appellate rights since the lack of notice caused their time to file a notice of appeal to expire. The rights having expired affected the view of the appellate court toward Conservancy and thereby denied them their ability to have a fair hearing as intended by Title 42 U.S.C. § 1981;

h.      Conservancy's counsel's moved to continue the trial and lodged an objection to expansion of issues beyond "whether or not Conservancy interfered with Parsons' use of the easement and, if so, the damages therefore." Despite efforts by Conservancy's counsel to gain cooperation from Parsons' counsel and Walkers'

counsel, they did not cooperate and no joint pretrial memorandum involving all of the parties, as required by Rule 16(d), was ever filed. Nor did Judge Olson's order of March 22, 2010, set forth any issues for trial;

i.    On April 12, 2010, Judge Olson conducted a trial over the objection and without the participation of Conservancy, or counsel, because of the complete failure of Judge Olson to adhere to the Rules of Civil Procedure, sometimes at the behest of counsel for Parsons and Walkers—a clear violation of the fundamental principal of due process of law;

j.    On April 29, 2010, the Pinal County Sheriff's Foreclosure Sale was held without conducting a Priority Hearing to determine the fair market value of the foreclosed property, in violation of A.R.S. § 12-1566 and A.R.S. § 33-814, violating the statute in a failure to follow due process of law;

k.    On May 4, 2010, Keating sent Conservancy's counsel a Notice of Lodging of Proposed Form of Judgment, without a copy of the proposed form of judgment attached, in violation of Ariz.R.Civ.P., Rule 5(j)(1)(E). Keating lodged two proposed judgments on May 17, 2010, in violation of the Court's order requiring proposed judgments be lodged before May, 4, 2010;

l.    On May 21, 2010, a hearing was held with concerning the judgments, and the Court signed Conservancy's counsel's order on his Motion to Withdraw. Conservancy was not represented at the hearing and was not allowed the statutory time to object to the Walkers' proposed form of judgment lodged on May 17. Judge Olson signed three judgments as presented by counsel for Parsons and

108

Walkers, essentially ceding his judicial authority and discretion to counsel for Parsons and Walkers, thereby engaging in joint action. The judgments contained gross violations of law that infringed upon Conservancy's constitutionally protected due process rights. In further violation of Conservancy's due process rights, there no effort was made to ensure that Conservancy was notified of the staggering judgments entered against them;

m.    The judgments signed on May 21, 2010 should not have been signed for the following reasons:

    i.    The Walkers' Judgment was derived from a Bench Trial without compliance with Rule 16(d)(1).  This was prejudicial because Conservancy was not notified that the issues to be tried included fraud, misrepresentation, and attorney's fees or anything about Pierron or Lipin personally;

    ii.    The Walkers' Judgment violated A.R.S. § 12-1566, in that the credit bid at the Sheriff's foreclosure sale was millions of dollars below the market value of the property, and in that the Conservancy was not given the statutory time to file a written application for a determination of fair market value;

    iii.    The Walkers' Judgment violated A.R.S. § 33-814, which requires a hearing to establish fair market value, and no judgment may be issued until the debtor has presented all relevant evidence relating to the fair market value;

iv.    The Walkers' Judgment was signed in violation of Ariz.R.Civ.P., Rule 58(d), because Conservancy was not allowed five days to file an objection to the revised proposed form of order lodged on May 17;

v.    The Walkers' Judgment was not served to Conservancy after it was signed by the judge in violation of to 17C A.R.S. Super. Ct. Local Rules, Pinal County, Rule 2.4 and Ariz.R.Civ.P, Rule 58(a). A review of the records on file with the Court does not show that any party was served with a copy of the Walkers' Judgment;

vi.    The Parsons' Judgment created a new width of easement that was not disclosed as a contested issue; further, the judgment speaks of driving cattle, which is inconsistent with prior rulings on the nature and scope of the easement. During a hearing on August 5, 2009, counsel for Parsons stated that the width of the easement was not an issue in the case;

vii.    The Parsons' Judgments were derived from a bench trial without compliance with 16(d)(1) in that a unilateral pre-trial statement was filed only two business days before trial Pierron and Lipin were not aware of any issues to be tried regarding their personal liability;

viii.    The Parsons' Judgment concerning damages against Pierron and Lipin, as individuals, is improper. Parsons had never amended into their complaint nor served Pierron and Lipin as individual defendants, nor did they indicate that they would be seeking damages against them individually. It is apparent that Judge Olson ceded his judicial authority and

allowed counsel for Walkers and Parsons to do whatever they wanted, in violation of the Rules of Civil Procedure, Rules of Evidence, and ethics rules governing both attorneys and judges;

ix.    The Parsons' Judgment was not properly served upon Pierron, Lipin, DPC, or Ranch after it was signed by the judge, pursuant to 17C A.R.S. Super. Ct. Local Rules, Pinal County, Rule 2.4 and Ariz.R.Civ.P, Rule 58(a) and Rule 58(e), despite counsel for Parsons and the Court knowing that none of these parties were represented by counsel.

n.    The Minute Entry issued from the Pinal County Court's September 16, 2011 hearing was not noticed to counsel for or to DPC or Ranch, in violation of their due process rights. Thus a hearing was held on October 4, 2011 with Loucks and Keating in attendance and without notice to or representation of Plaintiffs DPC and Ranch. Rulings were issued that affected these Plaintiffs. Judge Olson was complicit in proceeding without the Plaintiffs being notified or represented at the hearing. The Superior Court of Pinal County, over which Judge Olson presides, has been responsible for a pattern of lack of notice to Plaintiffs and their Counsel which has occurred too repeatedly and consistently to be attributed to mere negligence.

o.    During depositions held by Loucks and Keating on November 4, 2011, Defendants were clearly more interested in harassing Plaintiffs and finding ways to discredit them and gain information to use in this District Court action than they were in finding any current assets of DPC and Ranch, which was the stated

purpose of the depositions. Such advance discovery is not permitted and is in direct violation of Fed.R.Civ.P. 30(a)(2)(A)(iii) and Rule 26(d).

337.    Defendants have acted with the intent to hinder, obstruct, and/or evade culpability for their prohibited joint conduct under color of state law.

338.    As a direct and proximate result of the willful malicious acts, omissions, and constitutional violations alleged above, Plaintiffs have been severely damaged by Defendants' violations of 42 U.S.C. § 1983.

339.    Plaintiff contend that Defendants, and each of them, willfully and fraudulently concealed their acts from Plaintiffs, thereby tolling civil rights claims prior to two years before the date of filing of this Complaint. Where a civil rights plaintiff has been injured by fraud or concealment and remains in ignorance of it without any fault or want of diligence on his part, the statutory limitations period does not begin to run until discovery of the injury. *Briley v. State of California*, 564 F.2d 849, 855 (9th Cir. 1977).

**A.      Damages Caused by the Violation of Plaintiffs' Civil Rights**

340.    A person may not be deprived of their life, liberty, or property without due process of law. Due process of law requires that all legal procedures set by statute and court practice, including notice of rights, must be followed for each individual so that no prejudicial or unequal treatment will result. Plaintiffs were damaged in that the joint action of Defendants, judges, and governmental agencies under color of law denied Plaintiffs their right to due process of law and deprived Plaintiffs of their businesses, property, business opportunities, a significant amount of funds invested in the businesses and property, and caused personal humiliation, impairment to their reputations, and emotional and mental

distress because of these violations of their civil rights.

## FOURTH CAUSE OF ACTION

## VIOLATION OF ARIZONA ANTI-RACKETEERING ACT UNDER ("ARIZONA RICO") A.R.S. § 13-2314.04

### Against Defendants Mesch Clark & Rothschild, Cohen, Loucks, and Brimhall

341.    Plaintiffs hereby incorporate by this reference paragraphs 61, 79, 80, 99, 117, 118, 122-124, 130, 131, 133, 135, 139, 144-146, 150, 187, 188, 191, 209, 211, 219, 229, 261, 270, and 279.

342.    Mesch Clark & Rothschild, Cohen, Loucks, and Brimhall (for purposes of this section collectively "Defendants") engaged in a pattern of racketeering activity as set forth in A.R.S. §13-2301(D)(4)(b)(xv) by asserting false claims pursuant to a scheme to defraud, and knowingly violated A.R. S. §13-2311(a) by knowingly falsifying, concealing, and covering up material facts by any trick, scheme, or device and made and used a false writing or document knowing such writing or document contained false, fictitious or fraudulent statement or entry while engaging in business with state agencies or departments which, as set forth in A.R.S. §38-502(6)(a), includes the Court. Defendants committed the following specific allegations as well as other allegations contained in the factual allegations, as though fully set forth herein.

343.    MC& R caused to be and recorded the water rights certificate with the Pinal County Recorder, which evidenced the illegally certified stockpond in November, 2007, with the knowledge that the certification for the stockpond had been fraudulently obtained.

344.    In September 2008, in support of Parsons' summary judgment, filed in the Superior

Court in and for the State of Arizona for Pinal County, attorney Melvin Cohen ("Cohen")

attached a sham map that purported to set forth the actual location of the roads and trails for

determination of an easement and that were identified by Defendant Geoffrey Brimhall

("Brimhall") in his affidavit signed under penalty of perjury. The basis of the motion

asserted the Parsons-owned interest in the fraudulently certified stockpond. Several months

later, Cohen stated that contrary to the summary judgment motion map that simply showed

"proposed" locations for the easement, not the actual easement. To perpetuate further fraud

on the Court and Conservancy, Cohen stated that the map attached to the settlement letter

showed the true easement. Three months after the ruling in favor of Parsons' Motion for

Summary Judgment, which relied on the Brimhall map and affidavit, Brimhall admitted that

the affidavit was false. He also admitted that he was never hired to determine the location of

the easements in the matter, never identified any easements, and was unable to determine

the location of the easement. The affidavit had been prepared by Cohen, who knew or

should have known that the statements contained in Brimhall's affidavit and the map were

false.

345.    On or about September 18, 2008, in Parsons' Second Amended Complaint, Parsons

and Cohen and Loucks fraudulently alleged to the Superior Court in and for the State of

Arizona for Pinal County, wrongful diversion and unlawful appropriation of water and two

other counts based on the illegally "certified" stockpond and fraudulent "superior" water

rights created thereby.

346.    Defendants committed the offenses described herein for financial gain.

347.    Based upon these false statements and concealment of facts by Defendants MC&R,

Cohen, Loucks, and Brimhall, which were repeated by Defendants and relied upon by the Court in the 1,100 Acres case and which constitute acts of racketeering, Defendants obtained rulings and judgments against Conservancy that have caused foreseeable injury to Plaintiffs and their businesses as contemplated by A.R.S § 13-2314.04.

## A.      Damages Caused Racketeering Activity

348.    Through the actions of Defendants, Plaintiffs were damaged in their business and their property by their loss of property, businesses, business opportunities, and a significant amount of funds invested in the businesses and property. Because the damages are from reasonably foreseeable injury to Plaintiffs person, business, or property by a pattern of racketeering activity, the Plaintiffs are entitled to treble damages and costs of suit, including a reasonable attorney fees to be established at the time of trial.

**REQUESTED RELIEF**

WHEREFORE, Plaintiffs respectfully request this Court to enter judgment against the Defendants and all of them as follows:

On Plaintiffs' First and Second Cause of Action:

A.      Awarding Plaintiffs all allowable damages resulting from Defendants' RICO violations;

B.      Awarding treble damages pursuant to 18 U.S.C. § 1964(c);

C.      Awarding Plaintiffs' costs and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c); and

D.      Such other or further relief as the Court deems just and proper under the circumstances.

115

On Plaintiffs' Third Cause of Action:

A.     That this Court award Plaintiffs special damages in an amount to be proven at trial;

B.     That, pursuant to 42 U.S.C. § 1983, this Court award Plaintiffs fair and just compensation for the deprivation of Plaintiffs' constitutionally-guaranteed rights;

C.     That, pursuant to 42 U.S.C. § 1988, this Court award Plaintiffs reimbursement of their reasonable attorneys' fees and legal costs incurred in prosecuting this action;

D.     That this Court award Plaintiffs their court costs incurred herein;

E.     That this Court award Plaintiffs punitive damages against Defendants to discipline them and to deter these Defendants and others from any future unconstitutional conduct that is wanton, willful, and made with an evil hand and an evil mind;

F.     Such other or further relief as the Court deems just and proper under the circumstances.

On Plaintiffs' Fourth Cause of Action:

A.     Awarding Plaintiffs all allowable damages resulting from Defendants' RICO violations;

B.     Awarding treble damages pursuant to A.R.S § 13-2314.04;

C.     Awarding Plaintiffs' costs and reasonable attorneys' fees pursuant to A.R.S § 13-2314.04; and

116

D.    Such other or further relief as the Court deems just and proper under the circumstances.

DEMAND FOR A JURY TRIAL

Plaintiffs demand a jury trial pursuant to Federal Rules of Civil Procedure, Rule 38(b).

RESPECTFULLY SUBMITTED this 7th day of December, 2011.

By: /s/ Michael W. Berg

Michael W. Berg

Attorney for Plaintiffs

ORIGINAL, e-filed this 7th day of December, 2011, with:

Clerk of the Court

United States District Court

for the District of Arizona

117